In re Jack WEBER and Sharon Weber, Debtors.

AMERICAN SAVINGS & LOAN ASSOCIATION, Plaintiff,

v.

Jack WEBER and Sharon Weber, Defendants.

Bankruptcy No. 87B–04039.
Adv. No. 87PB–0790.

United States Bankruptcy Court, D. Utah, C.D.

April 7, 1989.

L. Mark Ferre, of Clyde, Pratt & Snow, Salt Lake City, Utah, for American Sav. & Loan Ass'n, plaintiff and creditor.

Randall Gaither, Salt Lake City, Utah, for Jack Weber and Sharon Weber, defendants and debtors.

## MEMORANDUM DECISION

JUDITH A. BOULDEN, Bankruptcy Judge.

This adversary proceeding arises from the objection of American Savings and Loan Association (American) to the chapter 7 discharge of Jack and Sharon Weber (Webers). American alleges that the debt owed by the Webers to American should be excepted from discharge under 11 U.S.C. § 523(a)(4) and (6). American further claims that the Webers' discharge should be denied under 11 U.S.C. § 727(a)(2) and (7).[1]

The court heard two days of evidence and has carefully considered the arguments of counsel. The court has reviewed the testimony, demeanor and credibility of the witnesses called by American,[2] as well as the documentary evidence and briefs submitted, and now sets forth the following memorandum decision as the court's findings of fact and conclusions of law.

## OVERVIEW

Weber Trucking, Inc., aka/dba Jack Weber Trucking (Weber Trucking), a chapter 11 debtor in possession, used American's cash collateral in violation of a cash collateral stipulation and order by collecting over $100,000 in pledged accounts receivable and using the funds to pay postpetition obligations. Weber Trucking had neither funds to satisfy the debt it owed to American nor property to support the replacement lien granted by the court to protect American against loss. The Webers, personal guarantors of the Weber Trucking obligation to American, filed their own chapter 7 petition in an attempt to discharge the obligation owed to American. American timely filed this adversary proceeding in the chapter 7 case challenging the Webers' right to discharge based on their conduct in the Weber Trucking chapter 11.

Jack Weber, the president, sole shareholder and a member of the board of directors of Weber Trucking, alleges that he turned over all legal matters regarding the chapter 11 to his attorney. All financial affairs during the operation of Weber Trucking as a debtor in possession were delegated to his comptroller. He blames these professionals' failure to inform him of Weber Trucking's responsibility as a debtor in possession for the subsequent violation of the court's order approving the cash collateral stipulation and for the use of cash collateral contrary to section 363(c)(2). Further, Jack Weber claims he was instructed at the section 341 meeting to keep all debts current during the chapter 11 or face dismissal of the case. Liquidation of the accounts receivable and use of the funds to pay postpetition debt in violation of the cash collateral order was purportedly to forestall such a dismissal.

Sharon Weber was the corporate secretary and a member of the board of directors of Weber Trucking. She assisted in collection of the accounts receivable and in payment of the funds collected to postpetition creditors. She defends by asserting that she proceeded under the instruction of her husband, Jack Weber, and was completely uninformed regarding Weber Trucking's bankruptcy. Sharon Weber asserts her obligation on the personally guaranteed debt should be discharged. She alleges that she merely collected accounts receivable to pay outstanding bills and never intended to injure American.

## FACTS

On January 25, 1985, Weber Trucking entered into a $150,000 Receivable Financing Loan and Security Agreement with American. The parties agree that American acquired a security interest, valid and

---

1. All citations are to Title 11 of the United States Code.

2. The Webers chose not to call witnesses.

perfected, in all Weber Trucking's accounts receivable and the proceeds thereof. The loan was executed by Jack and Sharon Weber as corporate officers. On March 3, 1986, the Webers personally guaranteed the obligation and provided further security for American's loan by way of a deed of trust on their home.

Jack Weber employed Sterling Carter (Carter) as Weber Trucking's comptroller. Together, Jack Weber and Carter operated Weber Trucking. Jack Weber acted as Weber Trucking's operations manager. He exercised the day-to-day administrative responsibility for the business. Carter controlled the books and records including the production of financial reports on the company's computer.

## WEBER TRUCKING'S CHAPTER 11

Outstanding tax liabilities resulted in Weber Trucking's decision to seek relief under chapter 11 of the Bankruptcy Code. A meeting to discuss the anticipated filing was held between Jack Weber, personal counsel for the Webers, bankruptcy counsel for Weber Trucking, and Carter. Evidence regarding what transpired at the meeting prior to filing is sketchy. What is clear is that neither bankruptcy counsel for the prospective debtor nor personal counsel for the Webers discussed the fiduciary duties of a debtor in possession with the principals of Weber Trucking. The statutory prohibition of section 363(c)(2) against the unauthorized use of cash collateral was not emphasized.[3] Bankruptcy counsel for the prospective debtor did not review any

---

3. Section 363(c)(2) states:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

Section 363(c)(2) is an absolute prohibition against the use of cash collateral by the debtor subsequent to filing. No further order preventing such use is necessary.

Section 363(c)(2)(A) allows the debtor's use of cash collateral if the consent of each entity having an interest in cash collateral is obtained. Unfortunately, consent is broadly construed by cash-short debtors who often interpret absence of vigorous objection as consent. As in the instant case, a loan officer merely wishing the debtor success in its rehabilitation is interpreted as consent. The practice has developed for the debtor to use cash collateral while negotiations are conducted regarding adequate protection, replacement liens, reporting requirements or supervision of the debtor. Marginally cooperative creditors protest the use of cash collateral but, either by agreement or by implicit consent, turn a blind eye to its use until an agreement is reached. This situation leaves the debtor using cash collateral while its counsel correctly advises that such use is prohibited. Eventually, a written agreement is produced. Counsel may or may not seek court approval of the stipulation. *Travelers Ins. Co. v. American Agcredit Corp. (In re Blehm Land & Cattle Co.)*, 859 F.2d 137 (10th Cir.1988) (decided upon facts arising prior to the enactment of Rule 4001(d) and with no discussion thereof). If no court approval is sought, the enforceability of such a stipulation is questionable. If the stipulation calls for the use of estate property other than in the ordinary course of business under section 363(b)(1) or provides a lift of stay under section 362(d) in the event of default without notice and a hearing, such provisions are unenforceable. The practice is further complicated by the pressure exerted by powerful creditors to exact favorable terms from the debtor for the continued use of cash collateral. Often, the result is to the detriment of the estate or other creditors.

To remedy what was perceived as a growing problem of "sweetheart" deals between the debtor and secured creditors, the 1987 amendments to the Bankruptcy Rules prescribed Bankruptcy Rule 4001(d). This rule provides a procedure whereby all stipulations for the use of cash collateral bear the light of public scrutiny before an order is entered approving such a stipulation. Notice of the motion and the stipulation must be forwarded to the unsecured creditors' committee or the twenty largest unsecured creditors and such other parties as the court may deem appropriate. Opportunity for objection must be given before the court may approve the stipulation.

The 1987 editor's comments to Rule 4001(d) in the Norton Bankruptcy Rules Pamphlet point out the following:

> Frequently the debtor in possession promises to furnish adequate protection to the party seeking relief from the automatic stay. Such an agreement possibly may have an adverse impact on the interest of the general unsecured creditors. This possibility also may be present when the debtor in possession agrees to furnish adequate protection in order to use cash collateral or to obtain credit. In these situations, the court may require a notice to all creditors before the agreement is approved.

Norton Bankruptcy Rules Pamphlet 1988–1989 Ed., p. 242.

documentation regarding American's loan, its security, nor discuss with the principals the consequences of the loan in relation to a debtor in possession's duties.

On May 9, 1986, the date of Weber Trucking's chapter 11 petition,[4] it owed American approximately $127,000 and had accounts receivable to secure the obligation of approximately $130,000. Between the date of filing Weber Trucking's chapter 11 petition and the section 341 meeting of creditors, Weber Trucking applied the money received from secured prepetition accounts receivable to pay postpetition debt without court authorization or the consent of American.

Jack Weber and Carter appeared for Weber Trucking at the section 341 meeting of creditors held June 12, 1986. They were accompanied by bankruptcy counsel. Lowell Mielke (Mielke) the loan officer of American who supervised Weber Trucking's account and counsel for American also attended the meeting of creditors. The exact events that transpired at the meeting of creditors are in dispute. Jack Weber asserts that he was directed by the "court"[5] to keep all obligations current during the pendency of his chapter 11 or the case would be dismissed. American denies such an instruction was given by the hearing officer.

A discussion described as upbeat and encouraging occurred in the hall after the section 341 meeting between Jack Weber, Carter, bankruptcy counsel for the debtor in possession and Mielke. Mielke expressed his desire to see Weber Trucking succeed in its chapter 11 reorganization. The issue of Weber Trucking's initial unauthorized use of cash collateral was not raised with Jack Weber by bankruptcy counsel for Weber Trucking until later that day. Jack Weber was then cautioned against the use of American's cash collateral. He protested that without permission

to use the accounts receivable he could not continue to run his business. Bankruptcy counsel replied, "You have to do what you have to do." After the section 341 meeting, Jack Weber clearly knew that cash collateral could not be used without an order of the court or the consent of American.

American learned of Weber Trucking's first unauthorized use of its cash collateral and filed a Notice of Interest in Cash Collateral (Notice) with the court on June 20, 1986. The Notice demanded that Weber Trucking cease using American's cash collateral. American asserted that it would consent to the use of cash collateral only if Weber Trucking agreed to a replacement lien on all postpetition accounts receivable and their proceeds.

In response to the Notice, bankruptcy counsel for Weber Trucking reviewed the applicable documentation pertaining to American's loan for the first time. A series of correspondence relating to cash collateral ensued between counsel for American and bankruptcy counsel for Weber Trucking. A cash collateral agreement was finally structured between the parties and eventually presented to the court in the form of a Joint Motion and Stipulation for Replacement Lien dated October 29, 1986. The stipulation was finally approved by the bankruptcy court after notice and a hearing on December 12, 1986 ("Order").

By the court's Order, American obtained a lien on all of Weber Trucking's postpetition accounts receivable and their proceeds in an amount equal to the unpaid portion of the outstanding loan to American. Weber Trucking was further required to make monthly principal and interest payments to American on the loan and to maintain current receivables equal to or greater than the balance due. The Order provided that Weber Trucking furnish to American monthly accounting statements containing

---

**4.** Weber Trucking, Inc., aka/dba Jack Weber Trucking, case number 86A–01967, was filed with the United States Bankruptcy Court for the District of Utah.

**5.** Section 341(c) provides that the court may not preside at or attend a meeting of creditors. No

judge attended Weber Trucking's section 341 meeting. No judge or officer of the court gave Jack Weber instructions to keep all the obligations of Weber Trucking current in order to prevent the chapter 11 proceeding from being dismissed.

information as to balances, payments, aging and collectability of accounts receivable. Copies of all invoices submitted to Weber Trucking's customers were to be forwarded to American and a lock box account established to ensure that payments from Weber Trucking's customers went directly to American. If the monthly accounting statements showed the current accounts receivable to be insufficient to adequately protect American, American could apply for an ex parte order prohibiting the use of cash collateral.

Mielke testified that he made various calls to Weber Trucking and spoke with Carter regarding compliance with the lock box, invoices and accounting requirements of the Order. Mielke did not speak extensively to Jack Weber regarding these issues because he was directed by Jack Weber to deal with Carter. During the term of the chapter 11 proceeding, both Mielke and Weber Trucking's bankruptcy counsel periodically phoned Carter to discuss the progress of the case. Jack Weber was aware of these conversations and discussed their general substance with Carter.

The evidence is unclear whether or not Jack Weber knew of the hearing to approve the Joint Motion and Stipulation for Replacement Lien. However his testimony clearly supports the finding that he was aware of the security interest of American prepetition and of the postpetition cash collateral replacement lien.[6]

Jack Weber made no effort to ascertain in more detail the status of the obligation owed to American or to gain more information regarding the course of the chapter 11 proceeding. He failed to ensure that Weber Trucking complied with the terms of the stipulation. No lock box was ever established even though it was requested by Mielke on several occasions. Not all of the principal and interest payments were made by Weber Trucking to American. Computer generated accounts receivable aging reports were not provided after March of 1987. Accounts receivable were deposited in Weber Trucking's own account and used in the ordinary course of its business.

## VIOLATION OF THE CASH COLLATERAL ORDER

On April 17, 1987, Jack Weber decided that continuation of Weber Trucking's business was impracticable. Without notice to Weber Trucking's bankruptcy counsel or American, he laid off all employees of the company, including Carter, stopped hauling freight and ceased generating new accounts receivable. His rationale for suspending operations was that he needed time to evaluate the viability of the business and determine if it could be rehabilitated. No rehabilitation occurred. Instead, Jack and Sharon Weber proceeded during April, May and June of 1987, to collect accounts receivable and to pay postpetition operating expenses from the amounts collected.

It was Jack Weber's stated intent, once the accounts receivable were collected and distributed, to re-establish a trucking business in some other capacity, probably as a broker. Many of the creditors paid postpetition were entities related to the trucking industry and there is a reasonable inference to be drawn that those paid were trade creditors with whom Jack Weber anticipated dealing in the future.

American, concerned regarding the status of Weber Trucking's chapter 11, contacted the company and was informed that all employees had been laid off and regular business had ceased. American thereafter initiated an examination of Weber Trucking pursuant to Bankruptcy Rule 2004. Through Jack Weber's testimony as the representative of Weber Trucking, American learned that accounts receivable had been collected and applied to current operating expenses. American applied for and received an ex parte order prohibiting the use of cash collateral on July 17, 1987.

---

**6.** Jack Weber is included in the court's mailing certificate for the Order. American's replacement lien was also set forth in the disclosure statement of Weber Trucking that was forwarded to and signed by Jack Weber. The disclosure statement is clear and unambiguous as it relates to American's loan and replacement lien. In fact, the entire disclosure statement is non-technical, unambiguous and could have been understood by Jack Weber with little effort.

American then brought an action in Weber Trucking's chapter 11 proceeding for sanctions for violation of the cash collateral Order.[7]

By July 15, 1987, Weber Trucking had collected approximately $119,000 from accounts receivable on which American had a replacement lien. $19,000 was placed in a bank account and $100,000 was paid on postpetition obligations of the Webers and Weber Trucking. Of the accounts receivable collected, American received a payment of $20,013.58 on July 22, 1987, and $3,400 in September of 1987. Approximately $11,000 in accounts receivable were left uncollected. Included in the disbursements from the cash collateral was $500 per week paid to Jack Weber personally for his salary and $200 paid to Sharon Weber for her temporary assistance.

The Webers filed their own chapter 7 petition on August 6, 1987, and listed the personally guaranteed debt of Weber Trucking to American on their schedules. The balance owing by Weber Trucking on the personally guaranteed obligation to American as of May 26, 1988, was $92,874.15 plus interest and costs.

## DISCUSSION

### JURISDICTION

The court has jurisdiction over the subject matter of and parties to this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157. Venue in this division is proper. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) and (J).

### EXCEPTION TO DISCHARGE UNDER SECTION 523(a)(4).

■ American argues that the debt owed to it is nondischargeable under section 523(a)(4).[8] The burden is on the plaintiff to prove its case by clear and convincing evidence. *Joseph v. Stone (In re Stone)*, 91 B.R. 589, 594 (D.Utah 1988) and, *S.J. Groves & Sons Co. v. Peters (In re Peters)*, 90 B.R. 588, 605 (Bankr.N.D.N.Y. 1988). For a ruling favorable to American, the court must determine (1) that Weber Trucking, as a chapter 11 debtor in possession, was a fiduciary, (2) that the Webers are personally liable to American if Weber Trucking breached its fiduciary duty, (3) that fraud or defalcation occurred and (4) that American sustained a loss as a result.

Is Weber Trucking, as a Chapter 11 Debtor in Possession, a Fiduciary?

■ Two Utah District Court opinions, *Orem Postal Credit Union v. Twitchell (In re Twitchell)*, 91 B.R. 961, 964–65 (D.Utah 1988) and *Stone*, 91 B.R. at 593–94, have largely settled any questions in this jurisdiction regarding the meaning of fiduciary as set forth in section 523(a)(4). The question regarding who has a fiduciary status for purposes of section 523(a)(4) is one of federal law. *Driggs v. Black (In re Black)*, 787 F.2d 503, 506 (10th Cir.1986). The federal law definition of fiduciary is different from the traditional common law definition and the construction is more restrictive as applied by section 523(a)(4). The purpose of the narrow construction is to limit exceptions to discharge and promote the debtor's fresh start. *Stone*, 91 B.R. at 591 (citations omitted). However, fiduciary capacity under federal law still connotes the idea of trust or confidence. *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir.1976).

■ Under section 523(a)(4), fiduciary capacity applies only to a technical trust, express trust or statutorily imposed trust and not to fiduciary relationships that arise under the common law from an equitable trust, implied trust, constructive trust or

---

**7.** Weber Trucking moved to dismiss its chapter 11 on June 16, 1987. The court denied the motion on July 20, 1987, and instead converted the case to a chapter 7.

**8.** Section 523(a)(4) states:
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
. . . .
(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .

an agency relationship. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). In addition, the trust or fiduciary duty must have been in existence prior to the occurrence of the act from which the debt arose. *Romero*, 535 F.2d at 621 (citations omitted).

■■■■ **Statutory Trust.** Section 1107 creates a statutorily imposed trust when a petition is filed. The presumption is that the debtor remains in possession [9] unless for cause shown or in the best interest of creditors [10], a qualified trustee is selected.[11] To establish a statutory trust an express legislative intent to create a trust relationship must be found in the statute. *Twitchell*, 91 B.R. at 966 (citations omitted). The legislative history of section 1107 clearly sets forth the trust relationship owed by a debtor in possession.

> This section places a debtor in possession in the shoes of a trustee in every way. The debtor is given the rights and powers of a chapter 11 trustee. He is required to perform the functions and duties of a chapter 11 trustee (except the investigative duties). He is also subject to any limitations on a chapter 11 trustee, and to such other limitations and conditions as the court prescribes.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 404 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 116 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5902, 6360.

The beneficiaries of this trust relationship are claimholders existing prepetition or that may arise postpetition. The trust res is property of the estate as defined in section 541. This includes any interest in property that the estate obtains after the petition is filed. The duties owed to the beneficiaries by the trustee are defined in part by sections 1107, 1106(a)(1) and 704(2). Section 704(2) provides that the debtor in possession, as trustee, shall be accountable for all property received.

As a trustee in a fiduciary capacity, the debtor in possession must use such property only under the terms and conditions imposed by the Code. These limitations are found in section 363(a) and (c). They limit the scope of a debtor in possession's authority to traffic in estate property and establish the express terms and conditions of the trust relationship between the debtor in possession and the creditors of the estate. Failure of the debtor in possession to abide by these limitations or to comply with the statute results in a breach of the terms of the statutorily imposed trust.

The court recognizes that the Code gives certain latitude to the debtor in possession to operate its business. Much is left to the sound business judgment of the debtor in possession. The Code allows the debtor in possession to use, sell or lease property of the estate in the ordinary course of business without notice or a hearing [12] unless the court orders otherwise. The presumption is that transactions in the ordinary course of business will inure to the benefit of the estate.

The Code also gives the debtor in possession substantial protection. It provides an opportunity to operate a business free of the immediate pressures of debt and allows the debtor in possession to remain in control of the management of its assets. In return, the debtor in possession need only follow the guidelines set out in the Code and the Rules. *Feldman v. Yaffe (In re Mr. Henry's Waldorf, Inc.)*, 34 B.R. 866 (Bankr.D.Md.1983). These responsibilities are imposed to protect creditors, equity security holders, the bankruptcy estate and those entities dealing with the debtor in possession postpetition. They are the quid pro quo of giving the rights of a trustee to a debtor in possession while allowing the debtor to remain in possession of its assets without bond.

If a section 1104 trustee were appointed in a chapter 11, no question would exist that the trustee was a fiduciary and that strict compliance with the statutory limitations on transactions in estate property

---

**9.** Section 1101(1).

**10.** Section 1104(a).

**11.** Section 322.

**12.** Section 363(c)(1).

would be mandated. Noncompliance with the statute would result in removal of the trustee for cause[13] and a possible bond surcharge.

No policy reason exists which would allow a debtor in possession to be held to a lower standard than a section 1104 trustee. As a practical matter, management, especially in a closely held corporation, may have difficulty switching hats and realigning its focus to its new duties as a debtor in possession.[14] These practical problems however, are not the proper concern of the court or creditors. They are the concern of the debtor and counsel for the debtor who should be especially diligent in educating management of the new debtor to its fiduciary responsibilities. *See Mr. Henry's Waldorf, Inc.*, 34 B.R. at 867. That process cannot and should not be shifted to creditors, the United States trustee or to the court. Those electing to avail themselves of the protection of the court should be allowed to do so only if they take seriously the responsibilities attendant to the filing. Debtors not wishing to assume those responsibilities have an obvious alternative.

■ **Express Trust.** American further argues that because of Weber Trucking's status as a fiduciary, the stipulation and Order created an express trust. "The elements for an express trust include (1) sufficient words to create a trust, (2) a clearly defined trust res, and (3) an intent to create a trust relationship." *Twitchell*, 91 B.R. at 965 (citations omitted).

Though Weber Trucking was acting in its capacity as a statutory fiduciary, that status alone is insufficient to create an express trust out of the stipulation. The elements necessary to create an express trust are absent. The stipulation merely provided American with a replacement lien on Weber Trucking's postpetition accounts receivable as a means to provide American continuous adequate protection. It failed fundamentally to contain sufficient words necessary to create an express trust. Though Weber Trucking was a debtor in possession, there was no express designation of trustee or trustor. The stipulation failed to enumerate the duties, responsibilities or powers the trustee would have in order to administer the trust. Nor was there a designation of a clearly defined trust res over which a trustee would exercise its fiduciary duties or responsibilities. In fact, the stipulation is void of any language indicating that the parties intended to create an express trust relationship. Such language clearly could have been included if the parties wished. The stipulation is, in effect, merely a commercial transaction similar to any other transaction entered into by the debtor in possession in the ordinary course of its business.

In the absence of the elements necessary to establish an express trust, American has failed to prove that Weber Trucking has breached any fiduciary duties arising solely from that document. Any breach of that agreement would merely give rise to a claim for breach of contract.[15] Under this analysis this court does not reach the issue concerning the violation of the prior court's Order approving the stipulation. Such a determination is unnecessary given Weber Trucking's liability as debtor in possession.

---

13. Section 324.

14. Conflicts arise after a corporation files chapter 11 regarding additional fiduciary duties. The board of directors still owes its primary responsibility to shareholders, but the new entity, the debtor in possession, now has a different focus. Its primary responsibility is owed to the creditors of the estate. Those entities are paid first. The interest of equity security holders are subordinated. There is no reason that these two interests and responsibilities can not co-exist and run parallel during the course of the chapter 11 in most instances. However, when the sole equity interest holder is also the president, on the board of directors, a creditor, co-obligor and manager of the debtor in possession, conflicts are axiomatic. M. Bienenstock, *Bankruptcy Reorganization* 72–6 (1987).

15. For example, failure to establish a lock box was a breach of the terms of the stipulation. The Code however, does not require the debtor in possession to maintain a lock box, therefore, no breach of the statutory fiduciary responsibilities set forth in the Code occurred. Had the failure to maintain a lock box been the only breach of the stipulation, American's remedy would have been for damages for breach of contract.

Determination of that matter is better left to the court issuing the Order and its exercise of its contempt power.

**Are Jack and Sharon Weber Personally Liable for Weber Trucking's Breach of Fiduciary Duty?**

■ Weber Trucking, as a close corporation, is distinguishable from a publicly held entity managed by a board of directors with multiple participants. As a practical matter, Weber Trucking was managed by one responsible party. That party was Jack Weber. For all intents and purposes Jack Weber conducted the operations of the business as a sole proprietorship. Jack Weber was the only functioning officer of the business. He was the 100% shareholder, the day-to-day manager and the overall decisionmaker for Weber Trucking. Although Weber Trucking's bankruptcy filing was a corporate filing, the person in control of Weber Trucking allowed the corporation to be involuntarily dissolved by the State of Utah on December 31, 1986, for failure to file an annual report.[16]

Jack Weber generally ignored the formalities of the corporate entity. No board of directors resolution authorized the chapter 11 filing. Jack Weber authorized it. No board of directors resolution authorized closing of the business and laying off of all employees. Jack Weber authorized it. No other officers or directors functioned in a managerial capacity in the business. For all purposes under the Code, Jack Weber was the responsible person in control of Weber Trucking.

In the face of a name only, sole-shareholder corporation, the question arises as to where to place liability for acts committed by this chapter 11 debtor. If a wrong was committed, liability should not be dodged simply because no dischargeability issue presents itself for the corporate entity under section 727(a)(1). The liability must, of necessity, fall on the person in control of the debtor. *Federal Deposit*

*Ins. Corp. v. Morris (In re Morris),* 51 B.R. 462 (Bankr.E.D.Tenn.1985). Even assuming that Weber Trucking had remained a valid corporation during the entire term of the proceeding, the corporate status would fail to protect from liability the party responsible for the corporate entity's violation of the statute.

Both Jack Weber and Sharon Weber are insiders of Weber Trucking within the meaning of section 101(30)(B).[17] An officer, director or shareholder of a corporation will not be shielded by the corporate veil from liability for tort, including fraud, in which the individual is involved. The Tenth Circuit has identified this rule as follows:

> It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom. But merely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation. Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party is necessary to generate individual liability in damages of an officer or agent of a corporation for the tort of the corporation.

*Lobato v. Pay Less Drug Stores, Inc.,* 261 F.2d 406, 408–09 (10th Cir.1958). Other courts have followed this general rule more recently and it is equally applicable to the present case. As stated in *McMillan v. Firestone (In re Firestone),* 26 B.R. 706, 714 (Bankr.S.D.Fla.1982):

> Firestone not only was the owner of the companies, but he also controlled the business operations. The evidence both of numerous specific acts of participation

---

**16.** *See Cedar Tide Corp. v. Chandler's Cove Inn, Ltd. (In re Cedar Tide Corp.),* 859 F.2d 1127 (2nd Cir.1988).

**17.** (30) "insider" includes—
  . . . .

  (B) if the debtor is a corporation—
    . . . .
    (ii) officer of the debtor;
    (iii) person in control of the debtor; . . . .

by the debtor and of his overall control of the operation, leading to the inference of further involvement, makes it clear that personal liability is proper here. *See Ward v. Guglielmo (In re Guglielmo)*, 30 B.R. 102, 109 (Bankr.M.D.La.1983).

The court recognizes the basis of this cause of action is not necessarily that of an alter-ego theory used in piercing the corporate veil. However, the analysis set forth in the leading cases in that area are instructive in the court's analysis of derivative liability for the principals. As previously described, the nature of Jack Weber's relationship with Weber Trucking is so inextricably intertwined with the corporate entity as to consume it. Such a unity of interest and ownership exists that the actions of the debtor in possession can only be attributed to Jack Weber. *ANR Ltd. Inc. v. Chattin*, 89 B.R. 898, 903 (D.Utah 1988) (*citing Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979)).

Under any circumstances, the actions of Weber Trucking were the actions of Jack Weber as the person in control of the debtor. Bankruptcy Rule 9001(5). No reason exists why liability for a person in control should be limited only to tort liability. The liabilities of Weber Trucking as the result of a breach of fiduciary duty clearly run to Jack Weber unprotected by the corporate status of Weber Trucking. *Mr. Henry's Waldorf, Inc.*, 34 B.R. at 868–69.

■ Sharon Weber, conversely, was not the controlling officer of Weber Trucking. The court cannot extend liability solely on the basis of being an officer or agent of the corporation. *Lobato*, 261 F.2d at 408. Active participation in the wrongful act is necessary. Though Sharon Weber assisted in the collection of accounts receivable and subsequent payments to creditors, she was unaware of the terms of the Order. She had no consultation with American relative to the terms of the use of cash collateral. She attended no court hearings.

Nor can the intent of Jack Weber be imputed to Sharon Weber absent other factors. *First Texas Savings Ass'n v. Reed (Matter of Reed)*, 700 F.2d 986 (5th Cir.1983). Merely because she was paid a nominal sum for her administrative assistance Jack Weber's intent or actions cannot be imputed to her. *Chicago Title Ins. Co., Inc. v. Mart (In re Mart)*, 75 B.R. 808, 810 (Bankr.S.D.Fla.1987). Some element of knowledge or intent must be present for the court to hold her liable for the breach of fiduciary duties of Weber Trucking. That knowledge or intent is lacking under the facts of this case. The court will not extend to Sharon Weber derivative liability for any breach of fiduciary duty by Weber Trucking.

Did Fraud or Defalcation Occur?

■ Having established the fiduciary status of Weber Trucking and the derivative fiduciary status of Jack Weber as the person in control of the debtor in possession, American must prove fraud or defalcation while acting in a fiduciary capacity. The consensus of the case law is that defalcation is the failure to account for money or property that has been entrusted to another. *Orem Postal Credit Union v. Twitchell (In re Twitchell)*, 72 B.R. 431, 435 (Bankr.D.Utah 1987) *rev'd on other grounds*, 91 B.R. 961 (D.Utah 1988). Defalcation is further defined as misappropriation of trust funds or money held in a fiduciary capacity. *Security Title and Guaranty Co. v. Campbell (Matter of Campbell)*, 79 B.R. 496, 498 (Bankr.M.D. Fla.1986). Defalcation is a broader term than either embezzlement or misappropriation and is evaluated by an objective standard. No element of intent or bad faith need be shown. *Peters*, 90 B.R. at 605 and *Twitchell*, 72 B.R. at 435.[18]

■ The use of American's cash collateral in violation of the Order had a two-fold effect. First, it voided the stipulation giving consent to the use of cash collateral under section 363(c)(2)(A). Second, the breach of the stipulation reinstated the sec-

---

**18.** This court considers instructive the bankruptcy court's opinion in *Twitchell* in which the court found that "negligence would be a more accurate term to use to describe this failure to account for funds as a fiduciary." *Twitchell*, 72 B.R. at 436.

tion 363(c)(2) prohibition against the use of cash collateral. Thus, the relationship between Weber Trucking and American reverted to one governed by section 363(c)(2) instead of section 363(c)(2)(A) because the terms and conditions under which consent was given were violated. As a result, Weber Trucking became strictly accountable for all property received by it as a trustee pursuant to sections 1106(a)(1) and 704(2). *Mr. Henry's Waldorf, Inc.*, 34 B.R. at 867.

Weber Trucking's dissipation of the cash collateral of American and the failure to replace it with new accounts receivable constitutes the failure to account for estate property under section 704(2). The failure to account for estate property is the failure to account for trust funds received and is a defalcation.

In a case similar to this, *Green River Prod. Credit Ass'n v. Alvey (In re Alvey)*, 56 B.R. 170 (Bankr.W.D.Ky.1985), the court recognized the importance of a chapter 11 debtor acting appropriately within the requirements of the Bankruptcy Code. The court observed:

> Relinquishment of personal control over the disposition of property is absolutely essential to the preservation of those creditors' rights already materially impaired—or at least deferred—by the Chapter 11 filing. The DIP who disposes of property of the Chapter 11 estate without first obtaining court approval does so at this peril.
>
> . . . .
>
> The debtor's complete respect for secured property rights is commanded by the Bankruptcy Code. Section 363(c) requires either creditor consent or prior court approval to use cash collateral, and in the well-managed Chapter 11 case the "motion to use cash collateral" is the very first pleading to be filed by the highly-leveraged debtor.

*Alvey*, 56 B.R. at 172–73.

The court in *Alvey* also recognized that a showing of defalcation under section 523(a)(4) is significantly less burdensome

than the showing of fraud necessary in a section 523(a)(2) action. "Proof of actual fraudulent intent is not necessary, and the burden is sustained upon a showing of misapplication of the trust funds." *Id.* at 173. The court further concluded that "the unauthorized use of cash collateral by a Chapter 11 debtor creates a prima facie case of breach of fiduciary duty in a nondischargeability complaint in a later Chapter 7 proceeding." *Id.* at 173–74. Jack Weber professes he did not intend to breach any duty or to harm American. Intent, however, plays no part in section 523(a)(4). It is merely the failure to account for trust funds which results in defalcation regardless of the existence of an intent to harm.

Did American Sustain a Loss?

The estate of Weber Trucking was originally filed as a chapter 11 and later converted to a chapter 7. No plan was confirmed to pay the debt owed to American. No evidence exists that the chapter 7 estate contains sufficient funds to satisfy the claim of American. As of the date of trial, the balance left owing to American on the loan guaranteed by the Webers was $92,-874.15. The court finds that the Webers' obligation to American remains outstanding.

In summary, the court concludes that American has met its burden of proving the necessary elements of section 523(a)(4) as it relates to Jack Weber. As a fiduciary charged with the duty to comply with all provisions of the Code and to protect the interests of all Weber Trucking's creditors, including American, Weber Trucking's unauthorized use of cash collateral constitutes defalcation while in a fiduciary capacity. The conduct complained of resulted in a substantial loss to American which remains outstanding. Jack Weber is the individual responsible for the actions of the debtor in possession. Therefore, the court concludes that as to Jack Weber American's debt should be excepted from discharge under section 523(a)(4).[19]

---

**19.** It is not necessary to review the additional elements necessary to prove embezzlement. The point is moot because establishment of de-

falcation by a fiduciary is sufficient to render the debt nondischargeable as to Jack Weber.

### EXCEPTION TO DISCHARGE UNDER SECTION 523(a)(6)

American must prove its case under section 523(a)(6) [20] by clear and convincing evidence. "[T]o have a debt determined to be nondischargeable for willful and malicious injury under section 523(a)(6), the complaining creditor must prove by clear and convincing evidence an intentional or deliberate act and an intent to injure." *Bank of Utah v. Auto Outlet, Inc. (In re Auto Outlet, Inc.)*, 71 B.R. 674, 679 (Bankr.D. Utah 1987).

American asserts that the Webers' conduct in the chapter 11 constituted willful and malicious injury to American's property. The injury resulted from (1) the unauthorized use of accounts receivable after Weber Trucking had ceased doing business, (2) the failure to maintain the accounts receivable at appropriate levels to protect American's lien and (3) the failure to provide proper records to American from which it could have ascertained the improper use of its collateral.

■ No dispute exists that Jack Weber intended, upon closing his business, to collect the accounts receivable pledged to American and that he willfully intended to pay those funds to postpetition creditors other than American. The issue is whether there is evidence sufficient to support by a clear and convincing standard the allegation that Jack Weber specifically intended to injure the property of American. "The sale of property subject to a security interest without payment of the debt may constitute willful and malicious conversion." *Auto Outlet*, 71 B.R. at 679 (citation omit-

ted). However, if Jack Weber's actions were merely negligent or reckless, or if he did not intend that his actions permanently impair the property of American, then the debt to American is not excepted from the discharge under section 523(a)(6).[21]

Though some courts have liberally construed section 523(a)(6), a strict construction is mandated in this jurisdiction by the decision in *Farmers Ins. Group v. Compos (In re Compos)*, 768 F.2d 1155 (10th Cir. 1985). In *Auto Outlet* the court reviewed the standard of intent required under the *Compos* decision.

> Section 523(a)(6) requires the proof of two elements: (1) willful and (2) malicious injury. As previously discussed, several courts have defined willful as requiring an intentional or deliberate act, and malicious as requiring an intent to injure. In *Compos*, however, the Tenth Circuit found that the phrase "willful and malicious injury" required an intent to injure. Nevertheless, this Court is of the opinion that the standard delineated in *Compos* requires first, implicitly, a finding of an intentional or deliberate act and second, a finding of a specific intent to harm.

*Auto Outlet*, 71 B.R. at 678. American must prove that Jack Weber had an actual, conscious intent to injure American by the conversion of its collateral.

■ From the evidence it is apparent that Jack Weber was willfully negligent in the conduct of the chapter 11 case. He was reckless in his handling of the accounts receivable. He purposely avoided those who would give him guidance regard-

---

**20.** Section 523(a)(6) states as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> ....
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;....

**21.** In the case of *Security State Bank of Houston v. Nelson (In re Nelson)*, 67 B.R. 491, 496 (Bankr. D.Minn.1985) the court states:

> For bankruptcy purposes, conversion is basically defined as the wrongful assumption of dominion by one person over personal prop-

erty belonging to another, to the exclusion of possession and control by the owner and in repudiation of the owner's rights.

The *Nelson* opinion further states that a mere technical conversion is insufficient to support a finding of nondischargeability. The plaintiff must show that the debtor acted with a state of mind that is both willful and malicious. *Nelson*, 67 B.R. at 496. The distinction to be drawn is whether the debtor performed the acts negligently, a circumstance which would make the debt dischargeable, or intentionally, a circumstance which would make the debt nondischargeable.

ing the use of cash collateral. He ignored the terms and conditions of the cash collateral Order regarding the lock box, reports and periodic payments. He intended to prefer certain creditors over American.

However, Jack Weber's explanation of his state of mind is somewhat credible and is supported by contemporaneous statements in the disclosure statement and plan. His assertion that he could recommence business as a broker and repay American is independently supported by Weber Trucking's disclosure statement which provided for funding from income derived from brokering for Drag 'n' Freight. This stated intent to fund the plan through brokering freight occurred at the same time Jack Weber and Sharon Weber were collecting the accounts receivable. It lends sufficient credibility to Jack Weber's testimony to prohibit this court from finding by clear and convincing evidence that Jack Weber and Sharon Weber had the specific intent required to injure American. Therefore, the court concludes that insufficient evidence exists to find the debt nondischargeable under section 523(a)(6).

## DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727(a)(2) AND (a)(7)

██ American suggests that the Webers should suffer a more significant penalty for their conduct. It urges denial of their discharge under 11 U.S.C. § 727. Section 727(a)(7) provides:

(a) The court shall grant the debtor a discharge, unless—

    . . . .

    (7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider; . . . .

Section 727(a)(7) extends liability to insiders of debtors for acts committed one year prior to the filing of the chapter 7 debtor's case. The applicability is clear. If liability is not litigated in the prior case, insiders are not later allowed to escape personal liability and discharge the debt. This section strengthens the court's ability to prevent abuse to the system as a whole and provides additional means to defeat a discharge of those who may damage the integrity of the bankruptcy system through impropriety in a prior case. As Collier tersely states, "This provision should help induce the cooperation of individuals in related bankruptcy cases." 4 *Collier on Bankruptcy* ¶ 727.10 (15th Ed.1988).

The court in *First City Bank—Central Park v. Powell (In re Powell)*, 88 B.R. 114 (Bankr.W.D.Tex.1988) explains the inter-relation of section 727(a)(7) and the other provisions of section 727.

Section 727(a)(7) makes an individual debtor liable to the extent he or she engages in conduct on behalf of an insider which violates any of the first six subsections of Section 727(a). Powell, as both 90% owner, officer, operator and prime employer of Fine Jewelry, was the human person who was the actor and decisionmaker for the corporate person, Fine Jewelry. Fine Jewelry is an insider under the Bankruptcy Code. 11 U.S.C. § 101(30). Thus, if Fine Jewelry can be said to have violated any of the provisions of Section 727(a), it did so by and through C.B. Powell.

*Powell*, 88 B.R. at 117.

American alleges that the Webers' use of American's cash collateral constituted the transfer and concealment of Weber Trucking property with the intent to hinder, delay or defraud American as set forth in section 727(a)(2). American also alleges that the action took place in Weber Trucking's chapter 11 within one year of filing this chapter 7 petition. Jack Weber, Sharon Weber and Weber Trucking are insiders of each other as defined in section 101(30)(A) and (B).

Section 727(a)(2) states:

(a) The court shall grant the debtor a discharge, unless—

    . . . .

    (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody

of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

. . . .

(B) property of the estate, after the date of the filing of the petition; . . . .

Section 727(a)(2)(B) requires a transfer or concealment of property of the debtor's estate. In this instance, the cash generated from the accounts receivable was property of Weber Trucking's estate under section 541(a)(7). The property was transferred, or was permitted to be transferred, in April, May and June of 1987, after Weber Trucking's chapter 11 petition was filed in May of 1986. Further, the dissipation of the property was concealed from American by the failure of Weber Trucking to file monthly accounting information with American from which it could have ascertained the transfers. Jack Weber testified that Carter was no longer available to generate the computer runs necessary to produce the accounting reports. This excuse is of no merit because Jack Weber and Sharon Weber kept books by hand during this period. The information was available and could have been forwarded to American but was nevertheless concealed from American. This action prevented American from exercising its rights under the Order to protect its position.

The remaining elements of section 727(a)(2) must be read in the disjunctive. 11 U.S.C. § 102(5) and 1A *Sutherland Statutory Construction* § 21.14 (4th Ed. 1985). A careful reading of the statute demonstrates that "it is not necessary to prove fraud; because the statutory language is disjunctive, an intent to hinder *or* delay suffices." *Randolph v. Somerville (In re Somerville),* 73 B.R. 826, 834 (Bankr.E.D.Pa.1987); *Huntington Nation-*

*al Bank v. Schwartzman (Matter of Schwartzman),* 63 B.R. 348, 360 (Bankr.S. D.Ohio 1986); and, *Morris* 51 B.R. at 464 (emphasis added).

The three intended actions under section 727 must be examined individually rather than collectively. To sustain the burden of proof necessary to grant a denial of discharge, a creditor need only prove that a debtor had the requisite intent to either (1) hinder or (2) delay or (3) defraud a creditor.

The significance of the disjunctive becomes apparent when one considers that a higher standard of proof, clear and convincing evidence, is required to prove fraud, [citations omitted], as opposed to the fact that the preponderance of the evidence applies to proof of an intent to hinder or delay creditors.

*Somerville,* 73 B.R. at 834. Therefore, if the facts of a case prove by a preponderance of the evidence that a debtor intentionally acted to hinder a creditor or intentionally acted to delay a creditor, then that debtor's discharge should be denied. *See Farmer's Co-op Ass'n of Talmage, Kan. v. Strunk,* 671 F.2d 391, 395 (10th Cir. 1982) [22] and *Somerville,* 73 B.R. at 834. Fraudulent intent may be inferred by circumstantial evidence or drawn from the debtor's course of conduct. *Farmer's Co-op,* 671 F.2d at 395; *Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871, 875 (8th Cir.1988); *First Beverly Bank v. Adeeb (In re Adeeb),* 787 F.2d 1339, 1343 (9th Cir.1986); and, *Devers v. Bank of Sheridan, Montana (In re Devers),* 759 F.2d 751, 753–54 (9th Cir.1985).

The seriousness of a section 727 denial of discharge mandates that the intent required to be proven by a preponderance of the evidence be an actual intent.

---

**22.** The court is aware of a trend of cases holding that the burden of proof in denying the debtor's discharge under section 727 should be by clear and convincing evidence. *See, e.g., Chittenden Trust Co. v. Mayo (In re Mayo),* 94 B.R. 315 (Bankr.D.Vt.1988); *Camacho v. Martin (In re Martin),* 88 B.R. 319, 321 (D.Colo.1988); and, *Booth v. Booth (In re Booth),* 70 B.R. 391, 394 (Bankr.D.Colo.1987). Neither the court in

*Martin* nor *Booth* distinguished the Tenth Circuit opinion in *Farmer's Co–Op.* It appears that the less stringent standard of preponderance of the evidence used to deny the debtor's discharge is justified to prevent an abuse of the bankruptcy system. If such an abuse has taken place, the more significant penalty of generally denying the debtor's discharge seems appropriate.

The nature of this intent is similar in this jurisdiction to that under section 523(a)(6) and requires not only a deliberate act but a specific intent to harm. *Auto Outlet*, 71 B.R. at 678. In a case decided in this jurisdiction interpreting 11 U.S.C.A. § 32(c)(4)[23] Judge Christensen reviewed the applicable standard of intent and determined it "was not merely a constructive or general intent on the part of the bankrupt". *In re Peters*, 266 F.Supp. 742, 745 (D.Utah 1967). Rather, the debtor's intent was said to be a "specifically intended, knowing and considered one". *Id.*

The interplay between section 523(a)(6) and 727(a)(2) is instructive. Both require actual specific intent. The harm in section 523(a)(6) however envisions injury or deprivation of property. By implication and wording that harm is of a relatively permanent nature. Conversely, section 727(a)(2) deals with intent to hinder or delay. While the standard of specific, actual intent is the same, the effect upon the victim is not. The meaning of hinder or delay conveys a transient or provisional, short-lived impairment impeding or hampering a creditor. The effect under section 727(a)(2) is not the injury of person or property covered by section 523(a)(6). Certainly however, such a drastic remedy as a denial of discharge should not be applied to insignificant or trivial delay of creditors, for the majority of creditors in a bankruptcy could be said to suffer hindrance or delay. To the contrary, the hindrance or delay must significantly impact the property rights of the creditor to its detriment. Such action must result in a reduction of assets available to creditors so as to substantially and materially hinder or delay their ability to obtain repayment.

This case is exemplary of the distinction. Jack Weber specifically intended his acts of collecting cash collateral and using it to pay creditors other than American. He did not however, specifically intend to permanently injure American. He thought he could repay American by generating new accounts receivable through his brokerage efforts.

However, Jack Weber did specifically intend to hinder and delay repayment to American as set forth by the Order. He failed to repay American at the same rate and time as other creditors. He ceased making monthly payments. He transferred the collateral to which the replacement lien attached and depleted the valuable accounts receivable so that none existed. He concealed the transfers by not providing accounting reports to American, thus preventing them from protecting their position.

Jack Weber attempts to excuse his actions by stating that he did not understand his responsibilities as debtor in possession. Though professing merely a seventh grade education, Jack Weber is an articulate, intelligent man who ran a substantial trucking company.[24] He had the physical and mental capacity to inquire into documents which came to his attention and into proceedings relative to the bankruptcy of his company and its financial affairs.

Jack Weber purposefully chose not to inquire regarding the status of his company's chapter 11 proceeding and purposefully chose to leave responsibility for the case in the hands of his bankruptcy attorney or his comptroller. In so doing, Jack Weber acted in violation of his duty as the person in control of a debtor in possession. He explains away the conversion of American's cash collateral as merely the result of his lack of information. The court finds otherwise. Jack Weber had access to Weber Trucking's bankruptcy counsel for the purpose of inquiry regarding the progress of the chapter 11 proceeding and the responsibilities of a debtor in possession. Indeed, the docket sheet of the chapter 11 proceeding indicates some 34 substantive pleadings filed relative to executory contracts, stay lifts, sales of property, etc., between the date of filing and July 20, 1987, the date the court entered an ex parte

---

**23.** 11 U.S.C. § 32(c)(4) is the predecessor under the Act of 11 U.S.C. § 727(a)(2).

**24.** Weber Trucking's disclosure statement at page 15 states that the "debtor has generated monthly receivables in the approximate amount of $140,000".

order prohibiting the use of American's cash collateral. Included in these pleadings was the debtor's approved disclosure statement.[25]

Jack Weber asserted that he was paying the postpetition debt based on the advice of counsel and the statement made by the deputy clerk at the section 341 meeting admonishing him to remain current on postpetition obligations. Both counsel and the deputy clerk deny telling Jack Weber to pay trade creditors with funds in which American had a security interest. To the extent there was reliance on any statements made by counsel or the deputy clerk, Jack Weber's reliance must be in good faith. *Adeeb*, 787 F.2d at 1343 (citation omitted). Furthermore, any protection based on reliance on counsel's statement will only act as a protection to the extent

the reliance was reasonable. *Norwest Bank*, 848 F.2d at 876. The damage to American was significant and only time will tell if it is able to recover funds from Jack Weber. With the damage to American in mind, there has been no showing that Jack Weber's reliance was in good faith or that it would have been reasonable to rely on statements made by counsel.

No credible explanation exists other than Jack Weber intended to and did delay and hinder American. With full knowledge of American's lien he spent nearly all of the money on trade creditors and administrative claimants, including himself and his wife.[26] Further, the assertion that he would repay the debt in the future through brokerage fees and thereby negate any intent to hinder and delay American is not supported by subsequent actions.[27] *Com-*

25. Weber Trucking's disclosure statement was filed with the court on April 23, 1987, and circulated to all creditors on May 15, 1987. A hearing was held on June 23, 1987, and the court approved the disclosure statement by order dated June 26, 1987. Only Weber Trucking's attorney attended that hearing seeking approval of the disclosure statement.

The disclosure statement contained no reference to the fact that Weber Trucking had ceased business operations one week prior to the date of the filing of the disclosure statement. At page 16 the disclosure statement indicates the debtor in possession has two full time weekly shop employees and one part time employee for weekends. The debtor's office staff consisted of three employees. The disclosure statement indicated that the

> Debtor will continue by way of brokerage services, to participate in freight transportation in all of the 48 states and its earnings from said brokerage service will be utilized in the funding of the debtor's plan. At the present time, it is contemplated that payment for freight hauling services performed by Drag 'n' Freight pursuant to brokerage services provided by the debtor herein will be paid to Weber Trucking Incorporated. Weber Trucking Incorporated will retain 20 percent of these funds, and remit the balance of 80 percent to Drag 'n' Freight.

Disclosure Statement at. p. 4.

The disclosure statement at page 17 discloses that Drag 'n' Freight was incorporated by Sterling Carter, among others. Sterling Carter would continue to be employed as comptroller by Weber Trucking, Inc. The disclosure statement further sets forth certain obligations of Weber Trucking which were assumed by Drag 'n' Freight and assets which were transfer-

red post petition to Drag 'n' Freight. A fork lift secured to Charter Thrift, two 1979 Datsun pickups secured to Valley Thrift, 10 freight tractors secured to CIT Corporation and 19 Great Dane Dry Vans secured to Transway Finance all found their way to Sterling Carter's company.

On June 16, 1987, while the disclosure statement was pending, Weber Trucking filed a motion to dismiss the chapter 11. That motion was not set forth in the disclosure statement. Nor was the motion heard by the court until after the disclosure statement hearing on June 23, 1987, and until after a substantial amount of the accounts receivable had been collected.

26. As set forth in *Somerville*, 73 B.R. at 834, the mere preference of the administrative claimants over American is insufficient to support a general denial of discharge under section 727(a)(2). Judge Christensen in *In re Peters* determined that more than a mere preference of some creditors over others must be involved. The bankrupt in *In re Peters* was shown not only to have preferred a creditor, but also to have acted on "a specific intent to hinder and delay" a creditor. *In re Peters*, 266 F.Supp. at 746. Based upon the existence of the specific intent to hinder and delay a creditor coupled with preferential treatment of creditors, Judge Christensen denied the debtor's discharge. And so it is with Jack Weber.

27. The court in *Nelson* stated "debtor's malice must be determined at least in part by the objective likelihood of harm to the secured creditor's interest created by the debtor's actions." One method of applying an objective standard of whether the actions of the debtor created an objective likelihood of harm to the secured creditor would include the "viability of the debtor's

*ercia Bank—Detroit v. Nahas (In re Nahas),* 92 B.R. 726, 730 (Bankr.E.D.Mich. 1988).

Sharon Weber assisted with bookkeeping matters in Weber Trucking's offices after the business closed. No evidence exists that she had knowledge of the cash collateral arrangements with American. She did not sign Weber Trucking's disclosure statement. She did not attend the section 341 meeting, cash collateral hearing, or disclosure statement hearing. She was also not involved in any conversations with Mielke or Carter regarding compliance with the cash collateral order. In short, though she was an officer and board member of Weber Trucking, her actual involvement was clerical and under the exclusive supervision of Jack Weber.

There has not been a sufficient showing that Sharon Weber's conduct would justify a denial of her discharge under section 727(a)(2) and (7). Though she knowingly used the funds to pay creditors, her violation of the Order was unintentional. *Morris,* 51 B.R. at 464. Based on the preponderance of the evidence there has not been a sufficient showing to find that she intended to hinder, delay or defraud American. Thus, Sharon Weber is granted her discharge.[28] *Powell,* 88 B.R. at 118. The court is persuaded however, that Jack Weber intended within the meaning of sections 727(a)(2) and (7) to hinder, delay or defraud American during the chapter 11 of Weber Trucking.[29]

## CONCLUSION

It is essential to the integrity of the chapter 11 process that a debtor in possession understand and abide by the fiduciary duty it owes to the creditors of its estate. The responsibilities imposed by the Bankruptcy Code cannot be ignored. Claimed ignorance of the law or lack of familiarity with legal concepts are insufficient excuses when a debtor in possession's breach of the statute injures a creditor. If the court fails to enforce the Code to protect creditors' rights in these circumstances creditors will cease dealing with debtors in possession, adversely impacting the entire rehabilitation process.

Jack Weber willfully disregarded his fiduciary responsibilities under the Bankruptcy Code. He chose not to seek guidance from bankruptcy counsel. Conversely, bankruptcy counsel failed to stress the importance of careful conformity with the statute. Instead, Jack Weber ignored the very process which afforded him protection to the detriment of the bankruptcy system as a whole. Such conduct can never be sanctioned by the court. It is justification for the denial of his discharge as set forth in 11 U.S.C. § 727(a)(7) and (2) as well as an exception to discharge under 11 U.S.C. § 523(a)(4).

Sharon Weber, acting without any specific knowledge of the terms of the cash collateral order, cannot be found to have had the intent necessary to require a denial of discharge or to except her debt to American from discharge.

The court concludes that judgment should be awarded in favor of American and against Jack Weber for the outstanding balance of the loan owed to it by Jack Weber and that the judgment is nondischargeable. Further, because of his actions in the Weber Trucking case, a general

---

business and his future prospects of generating income sufficient to pay the debt despite his diversion of collateral." *Nelson,* 67 B.R. at 498 n. 9. Using that objective standard in this instance and "[u]sing the benefit of hindsight as the objective test allows", the liquidation of substantially all accounts receivable without the business continuing in operation in order to replace those accounts receivable and without immediately initiating some other business or method of maintaining American's interests, supports the contention that Jack Weber intended the harm caused to American. *Nelson,* 67 B.R. at 498. In this case Jack Weber's actions

were "targeted at the creditor ... in the sense that [his] conduct [was] certain or almost certain to cause financial harm." *Nelson* 67 B.R. at 499 (omission and brackets in original).

**28.** The Fifth Circuit has ruled that the Code does not allow attribution of intent from one spouse to the other for purposes of objecting to the discharge under section 727. *Matter of Reed,* 700 F.2d 986.

**29.** Jack Weber's conduct justifies denial of his discharge under either a clear and convincing or a preponderance of the evidence standard.

denial of Jack Weber's discharge is warranted.

Counsel for American is directed to prepare a judgment in accord with this decision.