In re MAJOR FUNDING
CORPORATION, Debtor.

Ronald J. SOMMERS,
Trustee, Plaintiff,

v.

James G. SORCE, Defendant.

Bankruptcy No. 87–01026–H3–11.
Adv. No. 89–0381–H3.

United States Bankruptcy Court,
S.D. Texas,
at Houston.

Sept. 28, 1990.

---

**6.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

Richard Simmons, Lackshin & Nathan, Houston, Tex., for movant.

A.M. Thompson, Jr., Law Offices of A.M. Thompson, Jr., Houston, Tex., for defendant.

## MEMORANDUM OPINION

LETITIA Z. CLARK, Bankruptcy Judge.

Came on for trial plaintiff's Complaint to Recover Money or Property from defendant. After considering the evidence, pleadings, memoranda and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law and enters a separate Judgment in conjunction herewith, in favor of plaintiff. To the extent any findings of fact herein are construed to be conclusions of law, they are hereby adopted as such. To the extent any conclusions of law herein are construed to be findings of fact, they are hereby adopted as such.

Major Funding Corporation ("Major Funding"), the Debtor, voluntarily filed a Chapter 11 bankruptcy petition on January 30, 1987. On June 5, 1987, the plaintiff, Ronald J. Sommers, was appointed operating trustee upon court findings of incompetence and gross mismanagement by the principals of the Debtor, and in order to protect Debtor's assets from being further consumed. Trustee initiated this adversary proceeding to recover monies of the Debtor that defendant used for what the Trustee believes were non-business purposes.

Defendant was one of the founders and directors of the Debtor corporation and served as its President and Chief Operations Officer until December, 1983. Thereafter, he retained check writing authority on Debtor's accounts until June, 1987. Plaintiff alleges that defendant withdrew monies in the form of checks from Major Funding Corporation's Special Trustee Account # 10081 at Citizens' National Bank of Bellaire and used these funds for the following non-business purposes:

1. On April 12, 1985 defendant Sorce prepared check number 1887 for $125,000.00 payable to Plaza del Oro National Bank. On the same date, Sorce purchased 12,500 shares of voting stock in Plaza del Oro National Bank for James J. Sorce, his minor son, and 12,500 shares for Raymond A. Sorce, his minor son (Pl Exhibit Nos. 4, 6 & 7).

2. Check number 2245 for $17,000.00 was used to pay for cashier's check # 14980 at Citizen's National Bank on March 14, 1986 (Pl Exhibit Nos. 1 & 2). This check was used as a payment on a home purchase for defendant's son, John Sorce.

3. On May 19, 1986, defendant prepared check number 2431 for $21,678.00 (Pl Exhibit No. 16). The check contained the notation of its use to close an investor account. However, other evidence showed that the designated investor account had already been closed. The check was actually used to purchase cashier's check # 16263 which was subsequently cashed by defendant at the Princess Towers Hotel and Casino in the Bahamas (Pl Exhibit No. 15).

4. On June 6, 1986 defendant executed check number 2591 for $20,250.00 (Pl Exhibit No. 24). This check was used to purchase cashier's check # 16598 which was cashed by defendant for his personal use (Pl Exhibit No. 23).

5. On June 26, 1986 defendant executed check number 2676 for the sum of $29,274.46 made payable to Citizen's National Bank (Pl Exhibit No. 12). The check was used in part to purchase a cashier's check in the sum of $10,246.00 and partly for a deposit of $19,028.40 indicating "partial payment from J. Sorce on T. Miese lawsuit."

6. On July 2, 1986 defendant executed check number 2689 in the sum of $20,270.00 payable to Citizen's National Bank for the purchase of cashier's check # 17117 (Pl Exhibit Nos. 21 and 22). The cashier's check was cashed by defendant at the Princess Towers Hotel and Casino in the Bahamas.

The Trustee has pursued allegations of fraudulent conveyance of the bankrupt Debtor's property on two statutory bases. He seeks to void a fraudulent conveyance either pursuant to 11 U.S.C. § 548 or § 544(b). Section 548 specifically invalidates certain transfers, while § 544(b) provides for avoidance by the trustee of any transfer of an interest of the debtor in property or any obligation incurred that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under § 502 or that is not allowable only under § 502(e).

In order for the Trustee to prevail under 11 U.S.C. § 544(b) he must establish: 1) there was in fact a creditor in existence who was holding an allowed unsecured claim; and 2) that the transaction could have been avoided by such creditor under applicable state law. Plaintiff failed to allege, or to present any evidence to establish, that he had the requisite standing under § 544(b) to pursue his cause of action. *See In re Hall*, 22 B.R. 942 (Bankr. M.D.Fla.1982); *In re Acquafredda*, 26 B.R. 909 (Bankr.M.D.Fla.1983); *Schaps v. Bally's Park Place, Inc.*, 58 B.R. 581 (Bankr.E. D.Pa.1986); *In re Coors of North Mississippi, Inc.*, 66 B.R. 845 (Bankr.N.D.Miss. 1986).

As a result, this court finds that plaintiff has not sustained his burden of proof of establishing that he is entitled to pursue an action under 11 U.S.C. § 544(b). Alternatively, plaintiff requested relief under the applicable Texas Law, §§ 24.005 and 24.006 of the Texas Business and Commerce Code. Yet Texas law could have afforded relief to plaintiff in this proceeding only if properly pled in conjunction with a cause of action under § 544(b). Since plaintiff has not sufficiently pled nor proved a cause of action under § 544(b), he is further precluded from recovery by means of the state law causes of action for breach of fiduciary duty, conversion, negligence, assumpsit and money had and received.

Under § 548 however, the trustee may avoid any transfer of an interest of the debtor in property that was made on or within one year before the date of the filing of the petition. Since the filing of

the petition was more than one year after the transfer involving check number 1887, in the amount of $125,000.00, which was used to purchase stock certificates for defendant's minor children, it is beyond the scope of the powers vested in the Trustee by § 548. The remaining checks, however, fall within the one year period and the Trustee may avoid those transfers if the Debtor voluntarily or involuntarily:

> made such transfer[s] or incurred such obligation[s] with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer[s] w[ere] made or such obligation[s] w[ere] incurred, indebted.

The burden of proving all the requisite elements necessary to set aside a transfer as fraudulent under 11 U.S.C. § 548(a) is initially on the party challenging the particular transfer. When the transfer is made without adequate consideration, it raises a presumption of fraudulent intent that establishes a *prima facie* case and shifts the burden of proof. See *In re Reininger-Bone,* 79 B.R. 53 (Bankr.M.D.Fla. 1987).

Actual intent to defraud a creditor must be proven by clear and convincing evidence under 11 U.S.C. § 548(a)(1). *Stratton v. Equitable Bank, N.A.,* 104 B.R. 713 (Bankr.D.Md.1989). Due to the difficulty in proving intent to defraud, it may be implied from circumstances surrounding the transaction; the court may decide that there are sufficient indications present in the case to conclude that the controlling officer/director of a corporate debtor had formed actual intent to defraud a creditor. *In re Anchorage Marina, Inc.,* 93 B.R. 686 (Bankr.D.N.D.1988). A finding of requisite intent to make a fraudulent conveyance may be predicated upon a concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent. *In re Missionary Baptist Foundation, Inc.,* 24 B.R. 973 (Bankr.N.D.Tex.1982). Based on the totality of the circumstances, this court finds that the defendant had the req-

uisite intent to defraud. Defendant controlled the corporation and its finances. The funds from various corporate accounts were commingled and on all of the subject transactions, defendant intentionally used corporate funds for his and/or his family's personal benefit. These intentional actions by defendant resulted in Major Funding's creditors being defrauded.

Because the issue of intent is a fact determination, the court has closely examined the factual relationship between the Debtor and defendant. The Debtor, Major Funding, became a Texas closely held corporation in October, 1980 although it had been doing business in this state since 1976. The initial directors and incorporators were F.J. Wells, B.R. Foster and W. Russell. The initial registered agent was Frank Stephens. In October, 1980 all the original directors resigned and named James G. Sorce the sole director of the company.

Until December 31, 1983 James G. Sorce was President of Major Funding. Thereafter, Jonathan Grant was the titular head of the corporation until the appointment of the Trustee on June 5, 1987. In March, 1983 the registered agent was changed from Frank Herzog to James G. Sorce. Thereafter, in December, 1984 the registered agent was changed from James G. Sorce to Jonathan Grant.

Major Funding Corporation represented itself to be a mortgage broker. However, the testimony before the court demonstrated that the corporation was not a typical or conservative dealer in such matters. The court takes judicial notice of the following facts from this court's Opinion in *Joseph A. Custer v. Major Funding Corporation,* 87–01026–H3–11, filed Nov. 12, 1987, p. 2, Docket No. 570:

> In the typical transaction, a contractor such as Major United Steel Siding Corporation, a related entity, contracted with homeowners in the Houston metropolitan area for home improvements. The contractor loaned the homeowners the funds for these improvements, and in return received notes for the amount of the improvements, and received second lien

deeds of trust to secure repayment. Major Funding purchased these mortgages at below face value.

In order to interest investors, Major Funding advertised its "mortgage investment plan" in the local media, and distributed brochures detailing its benefits. Investors were assured that, for a minimum $5,000.00 outlay, they would receive monthly interest payments, or the interest would be compounded. Interest rates were advertised at from 15 to 20 percent and higher, and were guaranteed never to drop below the initial rate. Investors were told that their investments were "secured" by assignments of homeowners' Contracts for Labor and Materials and Deeds of Trust, and that such assignments were properly recorded. Despite that purported assignment of a lien, Major Funding assured investors that it would continue to pay the investors their promised interest notwithstanding any default in homeowner payments on the underlying lien. In such a case, Major Funding would "repurchase" the lien from the investor, and assign a new performing note and lien. Similarly, if a homeowner paid up his account in full, Major Funding would assign another note and lien to the investor. These assurances were used to demonstrate a further assurance to the effect that the investment was essentially riskless. (See Memorandum Opinion, *Joseph A. Custer v. Major Funding Corporation,* p. 3, Docket No. 570.)

In 1985, the State of Texas, through the Attorney General's Consumer Protection Division, filed a lawsuit against Major Funding in the 280th Judicial District Court, Harris County, Texas, on behalf of homeowners, alleging consumer credit violations, usury, deceptive trade practices and fraud. The State of Texas, through its Securities Division, intervened on behalf of investors. On May 29, 1986 state court Judge Tom Phillips signed an "Order on Intervention" ordering Major Funding in part to "assign to each investor a note secured by a lien, each complying with the Texas Consumer Credit Code." (See Memorandum Opinion, *Joseph A. Custer v. Major Funding Corporation,* p. 4–5, Docket No. 570.)

Apparently as a result of this Order, Jonathan Grant, then president of Debtor, sent to each investor an undated memorandum titled "Important Notice." This notice is reproduced in full:

> To comply completely with the State Securities Board's request for compliance under Section 5J of the Securities Code, Major Funding is now asigned (sic) to all investors, in addition to the Deed of Trust, the original promissory note. Such Assignment has already been completed.
>
> As an investor, you may either take possession of the original note or sign the enclosed safekeeping receipt and Major Funding will store the assigned note for you.
>
> The promissory note is the one document in the loan that cannot be reproduced or replaced, consequently the original must be returned to Major Funding at time of withdrawal. For that reason you may find it more convenient for Major Funding to maintain safekeeping. (See Memorandum Opinion, *Joseph A. Custer v. Major Funding Corporation,* p. 5, Docket No. 570.)

Immediately prior to Major Funding's February 5, 1987 bankruptcy petition, and for some time thereafter, investors visited Major Funding's offices and requested possession of their note or notes. Many notes were turned over both prepetition and postpetition, and there was evidence that, prior to appointment of a trustee in this case, some investors received notes as a result of settlements after seeking relief from the automatic stay in this Court. (See Memorandum Opinion, *James Ables, et al. v. Major Funding Corporation,* 82 B.R. 443, 446.)

Despite the assignment of notes and lien documents to investors, Major Funding retained possession of most of the notes and/or retail installment contracts and notes. (See Memorandum Opinion, *Joseph A. Custer v. Major Funding Corporation,*

p. 6, Docket No. 570.) Major Funding often recorded the assignments to the investors, along with the Contracts for Labor and Materials and Deeds of Trust, in the appropriate deed records, but the assignments were not perfected because there was no delivery of the instruments. See *Windham, et al. v. Citizens National Bank*, 105 S.W.2d 348, 350 (Tex.Civ.App.—Austin, 1937, writ dism'd; *In re Staff Mortgage & Inv. Corp.*, 625 F.2d 281, 283 (9th Cir.1980).

On the petition date, there were approximately 1,330 investors with approximately $50 million invested in Major Funding. Additionally, Major Funding administered 656 Individual Retirement Accounts worth a total of $6 million, and 14 Keogh accounts worth $380,000.00. (See Memorandum Opinion, *Joseph A. Custer v. Major Funding Corporation*, p. 6, Docket No. 570.) (The Internal Revenue Service later revoked its favorable opinion letter for Major Funding's IRA Trust Plan by correspondence dated July 14, 1987. The revocation was based upon grounds of misstatements of material fact made in the application filed by Major Funding [Def. EX No. 1]. Evidence is lacking as to what occurred thereafter.)

At the time of bankruptcy filing (January 30, 1982), Jonathan Grant held the title of president of Major Funding. Sorce was unavailable due to his being in prison. (Trial Testimony of John Kimbrough, 6/14/90). But before defendant, Sorce, in his words, "retired from the company" in 1986, he made various substantial disbursements of company funds. Defendant asserts that all of the transactions now at issue were performed on behalf of the Debtor at the instruction and request of the President, Mr. Jonathan Grant. However, every disputed check is signed solely by defendant. No written instruction or other evidence was presented to support Sorce's own testimony. Sorce was not a credible witness. Defendant was in fact one of the principals, and possibly the only principal, acting for Major Funding during 1986.

■ Trustee urges that Major Funding was merely a business conduit of defendant, and thus that Major Funding was the alter ego of James Sorce. In Texas, the corporate fiction will not be disregarded to hold an officer liable unless it is apparent that he was using the corporate form as a conduit for a violation of important principles of public policy. *Wolf v. Little John Corporation of Liberia*, 585 S.W.2d 774 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.); *In re Matthes*, 23 B.R. 162, 164 (Bankr.S.D.Tex.1982).

Defendant claimed he was not CEO of the Debtor, after March, 1983, but stated he was still involved with Major Funding as a "consultant." (Trial Testimony of James G. Sorce, 4/17/90; Trial Testimony of John Kimbrough, 6/14/90.) However, Sorce retained full check signing authority after March, 1983 until sometime in 1987. He continued to have the only large office in the suite, which Kimbrough considered to be the office of the "man in charge." Kimbrough testified credibly that Sorce emphatically stated to him that he ran the company. Defendant did not relinquish control over the business decisions of Debtor, nor over Debtor's finances earlier than June, 1987. Although defendant claims he was not an officer of Debtor during the period when the subject transactions occurred, between March and June of 1986, he solicited during that period a $275,000.00 investment from Parent Funding Corporation, another mortgage broker. Defendant misstated the value of the assets of Debtor (specifically as to Debtor's stock) on his personal financial statement, given to Parent Funding Corporation reflecting the assets available to repay Debtor's obligation, and then personally guaranteed the loan amount in order to secure the loan. (Pltf.'s EXs 27, 30, 32.)

■ The court follows a two step test in determining alter ego. The first step is to determine if there is such unity of interest and ownership that the separate per-

sonalities of the corporation and the individual no longer exist, *Watson v. Commonwealth Insurance Co.*, 8 Cal.2d 61, 68, 63 P.2d 295, 298 (1936). The second step is to determine if failure to disregard the corporate form would result in fraud or injustice, *U.S. v. Standard Beauty Supplies Store, Inc.*, 561 F.2d 774 (9th Cir. 1977).

In the case of Major Funding, Sorce's control over the corporation and his method of operating the business demonstrate a unity of interest and ownership. Sorce never relinquished his exercise of control over the business decisions made on behalf of Major Funding Corporation, nor over the finances of the Debtor. The various checking accounts were comingled and there was no special designation as to items to be processed through a particular account. Deposits received from investors were comingled with other corporate funds. The Major Funding Special Trustee account was used by Sorce for non-business purchases, resulting in the corporation's being used as a business conduit of Sorce. None of the transactions by Sorce from Major Funding Corporation's Special Trustee Account were for the benefit of Major Funding, its investors or creditors. An injustice would result to the creditors of the Debtor in the event the court failed to disregard the corporate form. The money defendant wrongfully obtained from the estate should be returned to the estate and administered for the benefit of the creditors of Debtor.

With respect to the transfers in question, when a principal so dominates the activities of a corporation, it is necessary to treat the dominated corporation as an agent of the principal. *Baker v. Raymond Intern., Inc.*, 656 F.2d 173 (5th Cir.1981), *cert. denied*, 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861 (1981). Major Funding maintained various checking accounts· at the Citizen's National Bank in Bellaire. According to the credible testimony of the accountant employed by the Trustee, there were no special restrictions made on each account, and frequently the funds were transferred from one account to another. (Trial Testimony of Mike Jason, 4/17/90.) These funds were from homeowner's payments received and interest accrued on various investor's accounts. Although payments were deposited in one account, they could end up in any account through the various transfers. Defendant was thereby able to withdraw unlimited funds from the Major Funding Special Trustee Account without having to be accountable for the source of those funds.

Because Major Funding never designated the accounts, they became one pool to provide payroll, internal business expenses, and interest payments to investors. Having overextended itself, Major Funding was having to borrow funds to make investor payments. (Cosby's Testimony, 5/10/90.) The effect of defendant's making needless withdrawals from Account # 10081 was to subvert the business and financial goals of the corporation.

The purpose of the alter ego doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable for the owner of a corporation to hide behind its corporate veil. *U.S. v. Standard Beauty Supplies Store, Inc.*, 561 F.2d 774, 777 (9th Cir. 1977). Furthermore, the doctrine of alter ego does not rest upon a particular creditor's dealings with or reliance on control of the entity, nor does it require a showing of fraud on a particular creditor. *S.I. Acquisition, Inc. v. Eastway Delivery Service*, 817 F.2d 1142 (5th Cir.1987). And although fraud is a frequent ground for application of the alter ego doctrine, it is not essential, and the courts will disregard the corporate fiction when its retention would produce injustice or inequitable consequences. *Bucyrus–Erie Co. v. General Products Corp.*, 643 F.2d 413 (6th Cir.1981). If defendant were not made accountable for his use of Major Funding monies, this would amount to injustice and inequity.

In addition, in accordance with 11 U.S.C. § 548(2)(A) & (B)(iii), if the Debtor received

less than a reasonably equivalent value in exchange for any transfers or obligations; and intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured, then the trustee may avoid those transfers or obligations.

After considering each one of the transfers made within one year prior to filing of bankruptcy, this court finds that none were made for an exchange of a reasonably equivalent value to the Debtor. Moreover, because testimony revealed that Major Funding was unable to make monthly interest payments towards its investment agreement with Parent Funding (Kimbrough's Testimony, 6/14/90), the Debtor was aware that it would incur debts that would be beyond its ability to pay as such debts matured.

The proceeds of check number 2245 were ultimately used to make a partial payment on a home purchase for John R. Sorce, defendant's son. (Pltf.'s EX Nos. 1, 2.) The estate was never reimbursed the $17,000.00 nor was defendant's explanation that the money was extended as payment for services rendered to Major Funding by his son satisfactory. The uncontradicted testimony of Jason was that he could find no records that John Sorce provided any services to Major Funding in any capacity that justified a salary. (Jason's Testimony, 4/17/90.)

Check number 2431 contained the notation of its use to close investor account # 0025178-3 of Oliver C. Ottensmeyer or Juanita L. Ottensmeyer. Despite this stated use of the funds, the Ottensmeyers' account had been closed over two weeks earlier. According to the Debtor's books, the Ottensmeyers were issued check no. 8223 in the amount of $149,666.08 to close their account. (Pl Exhibit Nos. 18, 19 & 20.) Check number 2431 was for the amount of $21,678.00. These funds were actually used to purchase a cashier's check that was cashed at the Princess Towers Hotel & Casino in the Bahamas. (Pltf.'s EX Nos. 15, 16.)

Not only did defendant misrepresent the intended use of the monies, but also the actual use did not demonstrate a reasonably equivalent value to the Debtor. Defendant kept no records of his trip to the Bahamas to entertain alleged potential investors. He did not identify any new client/investors so obtained for Debtor. The President of another mortgage brokerage company testified that in his view entertainment of clients in the Bahamas is not a justifiable expense. He would consider lunch or dinner sufficient entertainment. (Trial Testimony of Kimbrough, 6/14/90.) Check number 2689 for $20,270.00 was used for the purchase of cashier's check no. 17117 which was cashed at the Princess Towers Hotel and Casino. (Pltf. EX Nos. 21 and 22.) Defendant failed to show that the Debtor received any value from these expenditures.

Check number 2591 for $20,250.00 was used to purchase a cashier's check that defendant cashed and used for his personal benefit. (Pltf.'s EX Nos. 23, 24.) Defendant provided no evidence that this expenditure was for the benefit of the Debtor. There was no reasonably equivalent value to the Debtor.

Check number 2676 (Pltf.'s EX No. 12) was used in part to purchase a cashier's check in the sum of $10,246.00 and partly for a deposit of $19,028.40 indicating "partial payment" from J. Sorce on "T. Miese lawsuit." Defendant produced no evidence of a legitimate business purpose for these funds or even described the nature of or the existence of a "T. Miese lawsuit."

Defendant failed to keep any proper records on any of these transactions. His testimony has failed to show that the expenditures were for legitimate business purposes. In accordance with 11 U.S.C. § 542(a), defendant must turn over the value of these transfers to the trustee. Section 542(a) compels the turnover of "prop-

erty that the trustee may use, sell, or lease under § 363 ... unless such property is of inconsequential value or benefit to the estate." The transferred property is of value to the estate, and defendant is required to remit to the plaintiff Trustee the sum of the fraudulent transfers made by defendant. These sums are of the following:

1) Check Number 2245 for $ 17,000.00;
2) Check Number 2431 for $ 21,678.00;
3) Check Number 2591 for $ 20,250.00;
4) Check Number 2676 for $ 29,274.46;
5) Check Number 2689 for $ 20,270.00;

Total: $108,472.46.

Based upon the foregoing findings of fact and conclusions of law, this court grants judgment for plaintiff and enters a separate judgment in connection herewith.

## JUDGMENT

Pursuant to the Court's Findings of Fact and Conclusions of Law signed this same day on the Plaintiff's Complaint to Recover Money or Property, it is

ORDERED that there be judgment in favor of plaintiff Trustee in the amount of $108,472.46, and it is further

ORDERED that defendant is to turn over to the plaintiff Trustee, Ronald J. Sommers, the amount of $108,472.46 within *ten* days of the date of entry of this Order, with interest to run on any amount unpaid after such date at the rate of 7.78% percent per annum.