**In re Gary BLACK, Debtor.**

**BOMBARDIER CAPITAL INC., Plaintiff,**

**v.**

**Gary BLACK, Defendant.**

**Bankruptcy No. 93–41025.**
**Adv. No. 93–4151A.**

United States Bankruptcy Court,
E.D. Texas,
Sherman Division.

March 10, 1995.

---

510

Randall Boyd, Denton, TX, for debtor.

Patrick O'Rourke, Dallas, TX, for creditor.

## OPINION

DONALD R. SHARP, Bankruptcy Judge.

NOW before the Court is the Complaint to Determine Dischargeability of Debt filed by Bombardier Capital, Inc. (hereinafter referred to as "Plaintiff" or "Bombardier") against Gary Black ("Defendant") pursuant to regular setting. This opinion constitutes findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052 and disposes of all issues before the Court.

### FACTUAL AND PROCEDURAL BACKGROUND

There are no disputed facts in this case. The parties submitted the case on stipulations of agreed issues of law and facts as follows:

1. Defendant filed a Voluntary Petition for Relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") on July 22, 1993.

2. At all relevant times, Defendant was the president and controlling shareholder of

Discount Family Boats of Texas, Inc., d/b/a Texas Boating Center ("DFB") and was personally responsible for the day to day operations of DFB.

3. DFB is the subject of a bankruptcy proceeding which was filed on July 1, 1992 styled *In re Discount Family Boats of Texas, Inc., d/b/a Texas Boating Center,* Case No. 92–40742–CHA–11, currently pending in the United States Bankruptcy Court for Eastern District of Texas, Sherman Division.

4. On or about August 8, 1988, Bombardier entered into a loan transaction with DFB to finance, among other things, new boats and related equipment.

5. To evidence this loan transaction, on or about August 8, 1988, and on or about January 12, 1991, DFB executed two documents entitled "Inventory Security Agreement and Power of Attorney" (collectively, the "Financing Contracts").

6. Pursuant to the Financing Contracts, Bombardier loaned and advanced various sums of money to finance DFB's purchase of inventory consisting of new boats and related equipment.

7. As security for all advances made by Bombardier under the Financing Contracts, DFB granted to Bombardier a security interest in and to all of its inventory financed by Bombardier as well as a security interest in and to all returns, repossessions, exchanges, substitutions, replacements, attachments, parts, accessories thereto, and all goods used or intended to be used in conjunction therewith and all proceeds and products thereof, and documents relating thereto (collectively, the "Bombardier Collateral").

8. Pursuant to the Financing Contracts, DFB agreed that any and all proceeds of any sale, lease or other disposition of Bombardier's Collateral would be received and held by DFB in trust for Bombardier and would be fully, faithfully and promptly accounted for and remitted by DFB to Bombardier.

9. Defendant signed the Financing Contracts on behalf of DFB as its president and knew and understood the terms of the Financing Contracts.

10. DFB defaulted on its obligations under the Financing Contracts by, among other things, failing to make payments as called for in the Financing Contracts when and as due.

11. Defendant guaranteed all of the obligations and indebtedness of DFB to Bombardier pursuant to a guaranty agreement dated August 12, 1988 (the "Guaranty").

12. Pursuant to the Guaranty, Defendant unconditionally guaranteed to Bombardier that DFB would fully, promptly and faithfully perform, pay and discharge all of its present and future obligations and indebtedness to Bombardier. As a result, Defendant assumed direct contractual obligations to Bombardier and is personally liable to Bombardier for DFB's debt.

13. Pursuant to the Guaranty, Defendant owes Bombardier a total of one hundred twenty-seven thousand three hundred seventy-six and eighty-four/one hundred dollars ($127,376.84), plus interest.

14. After DFB filed its Voluntary Petition, the Bankruptcy Court entered certain cash collateral orders (collectively, the "Cash Collateral Orders").

15. Pursuant to the Cash Collateral Orders, DFB was required to maintain a segregated account into which the proceeds of Bombardier's Collateral were to be deposited ("Bombardier's Cash Collateral Account").

16. Pursuant to the Cash Collateral Orders, withdrawals from Bombardier's Cash Collateral Account were to be made only for certain specified purposes.

17. DFB withdrew or otherwise transferred the sum of $14,000.00 from Bombardier's Cash Collateral Account and delivered such $14,000.00 to another creditor of DFB, Transamerica Commercial Finance Corporation.

18. Prior to DFB's bankruptcy filing, DFB sold certain items of inventory financed by Plaintiff and failed to remit the proceeds of such sale to Plaintiff as required by the terms of the Financing Contracts ("Sales Out of Trust").

19. Such prepetition Sales Out of Trust total $54,144.82.

20. Prior to June 1, 1992, DFB had complied with the Financing Contracts by paying to Plaintiff the proceeds from the sales of inventory financed by Plaintiff in accordance with the terms of the Financing Contracts.

21. After the filing of DFB's bankruptcy, DFB sold inventory financed by Plaintiff in the total amount of $71,107.54.

22. According to the terms of the Cash Collateral Order, DFB was required to deposit the $71,107.54 into Bombardier's Cash Collateral Account.

23. DFB operated as a debtor in possession pursuant to Sections 1107 and 1108 while DFB was in Chapter 11.

24. Debtors in possession act as a trustee for the bankruptcy estate and owe fiduciary duties to the estate and its creditors.

25. DFB owed fiduciary duties to Plaintiff while it was operating in Chapter 11.

26. DFB's bankruptcy case converted to a case under Chapter 7 under the Bankruptcy Code on June 28, 1993.

27. At or near the time of conversion to Chapter 7, Bombardier's Cash Collateral Account contained approximately $45.00.

28. DFB failed to account to Plaintiff for the $71,107.54 that was at one time in Bombardier's Cash Collateral Account.

29. Plaintiff never received the $71,107.54 that was at one time in Bombardier's Cash Collateral Account.

30. At all relevant times, DFB acted through its president and majority shareholder, Defendant Gary Black.

31. If Defendant were called to testify, he would testify that all the actions taken by him contained in the stipulations above were done in his corporate capacity as president of DFB and that his purpose in taking these actions was to save the business and allow the reorganization of DFB and that he did not intend any direct personal gain from his actions.

---

**1.** § 523(a)(4) states:
  (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual from any debt—
  . . . .

## ISSUES

1. Whether Defendant's debt to Plaintiff should be excepted from discharge under section 523(a)(4) of the Bankruptcy Code for defalcation while acting in a fiduciary capacity.

2. Whether Defendant's debt to Plaintiff should be excepted from discharge under section 523(a)(6) of the Bankruptcy Code for willful and malicious injury to Plaintiff.

## DISCUSSION OF LAW

### A. EXCEPTION TO DISCHARGE UNDER SECTION 523(a)(4)

Plaintiff asserts that the failure of DFB to remit $71,107.54 in post-petition sale proceeds to Plaintiff requires an exception to discharge of Defendant's debt under section 523(a)(4).[1] Plaintiff has not asserted that section 523(a)(4) applies to any prepetition sales.

For a ruling favorable to Plaintiff, the Court must determine (1) that DFB, as a chapter 11 debtor in possession, was a fiduciary, (2) that fraud or defalcation occurred, (3) that Plaintiff sustained a loss as a result and (4) that Defendant is personally liable to Plaintiff if DFB breached its fiduciary duty. *American Savings & Loan Assoc. v. Weber,* 99 B.R. 1001, 1008 (Bankr.D.Utah 1989).

1. *Is DFB, as a Chapter 11 Debtor in Possession, a Fiduciary?*

Courts have consistently held that to be a fiduciary for purposes of dischargeability under section 523(a)(4), the debtor may be a trustee under a statutorily imposed trust. *LSP Investment Partnership v. Bennett,* 989 F.2d 779, 784–85 (5th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993); *Weber,* 99 B.R. at 1008–09; *Hayton v. P.T. Eichelberger,* 100 B.R. 861, 863–64 (Bkrtcy.S.D.Tex.1989).

Section 1107 of the Bankruptcy Code creates a statutorily imposed trust when a peti-

---

  (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
  . . .
11 U.S.C.A. § 523(a)(4) (1993).

tion is filed. The debtor in possession has all the rights and duties of a Chapter 11 trustee. 11 U.S.C. § 1107(a). The beneficiaries of this trust are the claimholders against the estate. *Weber,* 99 B.R. at 1009.

The parties have stipulated that DFB, as a chapter 11 debtor in possession, owed fiduciary duties to the Plaintiff. (Stip. 23, 24, and 25). Therefore, DFB was a fiduciary within the meaning of section 523(a)(4).

### 2. *Did Fraud or Defalcation Occur?*

■ Defalcation involves the failure to account for money or property held in a fiduciary capacity. *Carey Lumber Co. v. Bell,* 615 F.2d 370, 376 (5th Cir.1980); *Highland v. Hix,* 161 B.R. 401 (Bkrtcy.N.D.Ohio 1993); *Eichelberger,* 100 B.R. at 866; *Weber,* 99 B.R. at 1012. There is no necessary element of intent. *Hix,* 161 B.R. at 405; *Weber,* 99 B.R. at 1012.

■ DFB was required by the terms of the Financing Contracts and the Cash Collateral Order to deposit proceeds from the sale of inventory financed by Plaintiff into a separate cash collateral account and, eventually, remit these proceeds to Plaintiff. After the filing of DFB's bankruptcy, DFB sold inventory financed by Plaintiff in the total amount of $71,107.54. (Stip. 21). Plaintiff never received the $71,107.54 and DFB failed to account for the money. (Stip. 28 and 29). Furthermore, $14,000 of Plaintiff's Cash Collateral was paid to Transamerica Commercial Finance Corp. ("Transamerica"), another creditor of DFB. This clearly amounts to a defalcation by DFB under section 523(a)(4).

### 3. *Did Plaintiff Sustain a Loss?*

DFB's bankruptcy case converted to a case under Chapter 7 of the Bankruptcy Code on June 28, 1993. The indebtedness guaranteed by Defendant remains unpaid. The Court finds that Plaintiff sustained a loss in the amount of $71,107.54.

### 4. *Is Defendant Personally Liable for DFB's Breach of their Fiduciary Duty?*

■ There is no doubt that there was a defalcation by DFB while in a fiduciary ca-

pacity under section 523(a)(4). If DFB was the Defendant herein, the inquiry could end here and the stipulations of the parties make it clear that the debt would be nondischargeable as to DFB. However, the issue in this case is whether or not Defendant, Gary Black, personally breached a fiduciary duty that he had to the Plaintiff or whether Gary Black, as an officer and majority shareholder of DFB, can be held personally liable for the defalcation by the corporation.

Plaintiff asserts that *John P. Maguire & Co., Inc. v. Herzog,* 421 F.2d 419 (5th Cir. 1970), supports their position that Defendant should be held personally liable. In that case, Herzog was the president, director and chief managing officer, as well as owner of seventy-nine percent of the stock of a corporation that entered into a floor plan financing arrangement similar to the one entered into by DFB and Plaintiff. *Id.* at 420. Herzog used the cash collateral to pay certain other corporate debts on which he was secondarily liable, thus improving his personal position. *Id.* at 421. The court imposed liability on Herzog because he had misused his position to gain personal benefit at the expense of the corporation or corporate creditors. *Id.* at 422.

In the present case, there has been no indication that Defendant has gained a personal benefit by not remitting the funds to Plaintiff. Consequently, the Court cannot impose liability on Defendant under the *Herzog* analysis.

■ Plaintiff further asserts that the *Weber* case justifies holding the defendant personally liable. In *Weber,* the court used an analysis similar to the alter-ego theory used in piercing the corporate veil. *Weber,* 99 B.R. at 1012. In that case, Weber was an officer in a corporation that entered into a floor plan financing arrangement similar to the one entered into by DFB and Plaintiff. *Id.* at 1005. Weber used the cash collateral to pay other postpetition obligations of the corporation. *Id.* at 1006–08. The court found that Weber conducted the operations of the business as a sole proprietorship. *Id.* at 1011. He was the only functioning officer of the business and the 100% shareholder.

*Id.* He generally ignored the formalities of the corporate entity by personally authorizing the Chapter 11 filing and the closing of the business and laying off of all employees. *Id.* The court found Weber personally liable by effectively piercing the corporate veil. *Id.*

■ In Texas, the corporate fiction will not be disregarded to hold an officer liable unless it is apparent that he was using the corporate form as a conduit for a violation of important principles of public policy. *In re Major Funding Corp.*, 126 B.R. 504, 510 (Bkrtcy.S.D.Tex.1990). Courts follow a two step test in determining alter ego. The first step is to determine if there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. *Id.* at 510–11. The second step is to determine if failure to observe corporate formalities would result in fraud or injustice. *Id.*

■ In order to warrant piercing of the corporate veil, the courts generally require evidence that the corporate entity amounts to fraud, promotes injustice, or is relied on to justify a wrong; or that the corporation was inadequately capitalized; or that an individual controls or manages the entity in such a manner that it becomes his alter ego; or that the corporate formalities were not adhered to by the corporation. 15 Tex.Jur.3d, Corporations §§ 12, 13 (1981). Courts have been persuaded to ignore the existence of the corporate entity where it is shown that the corporate organization is illegally conducted, that regular corporate procedure has not been followed, or that corporate and individual transactions have not been separate and distinct. *Id.*

The parties have stipulated that Defendant, at all relevant times, was the president and controlling shareholder of DFB and was personally responsible for the day to day operations of DFB. (Stip. 2). The parties further stipulated that, at all relevant times, DFB acted through its president and majority shareholder, Defendant. (Stip. 30). The

Court has been presented with no other evidence as to the business operations of DFB to show that DFB was the "alter-ego" of Defendant. The Court believes this to be insufficient evidence to justify piercing the corporate veil under the alter ego theory.

■ Defendant, at all relevant times, was acting in his official capacity as corporate president. There is no evidence to suggest that any actions of Defendant were ultra vires. In fact, stipulation 31 clearly negates any intent on the part of Defendant to take any action other than the discharge of his duty to the corporation and no stipulation gives the Court any basis for ignoring the corporate existence. This Court declines to extend personal liability to corporate officers for actions by the corporation in violation of section 523(a)(4), unless there is sufficient evidence to pierce the corporate veil under the alter ego theory. Therefore, Defendant's debt will not be excepted from discharge under section 523(a)(4).

## B. *EXCEPTION TO DISCHARGE UNDER SECTION 523(a)(6)*

Plaintiff asserts that the failure of DFB to remit to Plaintiff proceeds from prepetition Sales Out of Trust totaling $54,144.82 and proceeds from postpetition sales totaling $71,107.54 requires an exception to discharge of Defendant's debt under section 523(a)(6).[2]

For a ruling favorable to Plaintiff, the Court must determine that (1) there was a willful and malicious act within the meaning of section 523(a)(6) and (2) that Defendant can be held personally liable for such act.

### 1. *WILLFUL AND MALICIOUS*

■ "Willful", as used in section 523(a)(6), means deliberate or intentional. "Malicious", as used, means in conscious disregard of one's duties, or without just cause or excuse, and does not require ill will or specific intent to do harm. *Chrysler Credit Corp. v. Perry Chrysler Plymouth*, 783 F.2d

---

**2.** § 523(a)(6) states:
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual from any debt—
. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . .
11 U.S.C.A. § 523(a)(6) (1993).

516

480, 486 (5th Cir.1986); *In re Dean*, 79 B.R. 659, 662 (Bkrtcy.N.D.Tex.1987). An intentional deprivation of another person's property is sufficient to satisfy the maliciousness requirement. *In re Cauthen*, 152 B.R. 149, 153 (Bkrtcy.S.D.Tex.1993). Conversion of property or funds has been held to constitute a willful and malicious act under section 523(a)(6). *Transamerica Commercial Finance Corporation v. Littleton*, 942 F.2d 551, 554 (9th Cir.1991).

 DFB knew that it was under a duty to remit sale proceeds to Plaintiff. Nevertheless, DFB used those funds to pay other expenses including paying another creditor $14,000. This clearly constitutes a willful and malicious act within the meaning of section 523(a)(6). However, the conversion was by DFB; Defendant did not convert the funds to his own personal use.

## 2. *PERSONAL LIABILITY*

Again, the main issue in this case is whether Defendant can be held personally liable for his actions as a corporate officer. At all relevant times, Defendant was acting on behalf of the corporation in his official capacity as president. Plaintiff asserts that this should not shield Defendant from liability, and Defendant should not be able to receive a discharge of this debt.

Several cases have held that the debts incurred by corporate officers who participated in the conversion of property or funds should be subjected to an exception to discharge under 523(a)(6). *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257 (11th Cir. 1988); *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556 (11th Cir.1987); *Perry*, 783 F.2d at 480. However, in each of those cases, the officer had committed some ultra vires act to obtain a personal benefit. In *Rebhan*, Rebhan deposited part of the funds in his own personal bank account. *Rebhan*, 842 F.2d at 1260. In *Owens*, Owens transferred money to another corporation that he owned. *Owens*, 807 F.2d at 1557. In *Perry*, Perry took proceeds from car sales to Las Vegas to gamble. *Perry*, 783 F.2d at 485. Therefore, in each of these cases, the officer had converted the funds to his own personal use.

Conversely, in the present case, there has been no evidence that Defendant has committed any ultra vires act of conversion. Furthermore, there has been no evidence that Defendant obtained any personal benefit by failing to remit funds to Plaintiff. The only evidence presented indicates that Defendant was acting in his authorized corporate capacity and that he was attempting to obtain a benefit for the corporation by keeping it operational. Therefore, the Court cannot hold Defendant personally liable under this line of case authority.

The only other method of holding Defendant liable under section 523(a)(6) would be piercing the corporate veil under the alter ego theory. As discussed earlier, the Court has been presented with insufficient evidence to impose liability under that theory.

 This Court declines to extend personal liability under section 523(a)(6) to corporate officers for performing their proper role in the corporation, without some evidence of ultra vires acts or sufficient evidence to pierce the corporate veil. Therefore, Defendant's debt will not be excepted from discharge under 523(a)(6).

The parties have stipulated that Defendant is personally liable for the debt in the amount of $127,376.84 pursuant to the guaranty. (Stip. 12 and 13). That amount is allowed as a general unsecured claim. For the reasons stated in this opinion the Court hereby DENIES all further relief requested by Plaintiff.