In re Thomas Dean McGALLIARD, Debtor.

FIRST LEASING COMPANY, Plaintiff,

v.

Thomas Dean McGALLIARD, Defendant.

Bankruptcy No. B–92–12279C–7W.
Adv. No. 93–2175.

United States Bankruptcy Court,
M.D. North Carolina,
Winston–Salem Division.

May 19, 1995.

Phillip E. Bolton, Greensboro, NC, for defendant/debtor.

M. Joseph Allman, Trustee, Winston–Salem, NC.

Mark C. Kirby, Raleigh, NC, for plaintiff.

## MEMORANDUM OPINION

WILLIAM L. STOCKS, Bankruptcy Judge.

This adversary proceeding came before the court for trial on March 22 and March 29, 1995. Both parties called witnesses and offered documentary evidence. Having heard and considered the evidence offered by the parties and having considered the arguments of counsel, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. First Leasing Company ("FLC") obtained a judgment against Thomas Dean McGalliard ("Debtor") on November 1, 1991 in the amount of $18,219.26 plus attorneys' fees of $5,730.48 in the District Court of Wake County.

2. On February 5, 1992, Debtor filed a motion to claim exempt property in the District Court of Wake County. FLC objected to the motion and a hearing was held in the District Court of Wake County during the week of April 3, 1992, concerning the motion and FLC's objection thereto.

3. Debtor's motion was allowed except:

a. A 1978 Dodge automobile was declared to be non-exempt property;

b. Certain cameras owned by Debtor were declared to be non-exempt property;

c. Certain stock consisting of 43,000 shares of Investors Technology Company,

which is listed on NASDAQ as IVES, was declared to be non-exempt property; and

d. Debtor was ordered to deliver the title to the 1978 Dodge automobile to FLC, make the cameras available to the sheriff of Forsyth County, furnish all available information to FLC's attorney regarding the IVES stock and "cooperate with" FLC to determine the status of Debtor's interest in the R.J. Reynolds Tobacco Company ("RJR") deferred compensation plan administered by his employer, RJR.

4. Having received no information from Debtor regarding the RJR deferred compensation plan, on June 15, 1992 FLC issued and served a subpoena on RJR seeking information regarding Debtor's interest in the RJR deferred compensation plan. RJR responded with information furnished to the attorney for FLC reflecting that Debtor had retired on May 1, 1992, that at retirement Debtor's interest in the RJR/Nabisco Capital Investment Plan was $93,355.71, and that his interest in the RJR/Nabisco Capital Investment Plan had been distributed to Debtor on May 29, 1992.

5. On June 25, 1992, Debtor opened an individual retirement account with his broker, Cowen & Company, and deposited $81,-968.21 which was the taxable portion of his distribution from RJR.

6. Following a series of correspondence between counsel for Debtor and counsel for FLC regarding the RJR distribution and whether the funds in the IRA account at Cowen & Company were exempt, on July 23, 1992, FLC moved in the District Court of Wake County for further examination of Debtor and to hold Debtor in contempt for not complying with the earlier district court order directing Debtor to turn over property, etc.

7. On Friday, September 18, 1992, a hearing on the FLC motion was held in the District Court of Wake County at which Debtor was examined under oath regarding the RJR distribution and his disposition of the funds received from RJR upon his retirement.

8. Several days prior to the hearing on September 18, 1992, Debtor communicated by telephone with Cowen & Company and requested that Cowen & Company issue a check for the full amount in his IRA account payable to the Internal Revenue Service ("IRS"). Following this conversation, Cowen & Company realized that it could not issue a check payable to the IRS because it did not have written authorization from Debtor to do so. Cowen & Company attempted to communicate with Debtor but was unable to reach him. Cowen & Company then issued a check payable to Debtor (not the IRS) for $83,653.77, representing the value of Debtor's IRA account, and forwarded the check to King Studio, Clemmons, North Carolina, Debtor's business address. King Studio is a business operated by Debtor's wife. The issuance of this check and the forwarding of the check by Cowen & Company occurred prior to September 18, 1992.

9. During his testimony in district court on September 18, 1992, Debtor testified that he had requested that his account at Cowen & Company be closed and that the check for the proceeds of the account be issued payable to the IRS. A recess was taken by the district court in order to permit Debtor to call Cowen & Company to determine if the check issued by Cowen & Company had been cashed by the IRS. During the recess, Debtor placed a telephone call to Cowen & Company. According to Debtor, the information which Debtor received from Cowen & Company was that the check had been issued by Cowen & Company but had not cleared as of that time. According to Debtor, he was not told during this conversation that Cowen & Company had issued the check to him rather than to the IRS as he had requested. There was no evidence to contradict this testimony by Debtor, nor was there any direct evidence that Debtor was made aware that the check had been mailed to Debtor's business address instead of to the IRS.

10. When the hearing resumed, Debtor stated under oath to the court that Cowen & Company had issued the check as requested by Debtor, but that the check issued by Cowen & Company had not been cashed as of that time. According to Debtor, at the time he gave this testimony to the district court, he was not aware that the check had

actually been issued payable to him, rather than to the IRS as he had requested. Plaintiff presented no evidence contradicting Debtor's testimony in this regard.

11. Following the testimony of Debtor, the District Court of Wake County issued an order directed to Cowen & Company and ordering Cowen & Company to immediately "stop payment on its check to IRS representing a distribution in excess of $81,000.00 on the account of Thomas D. McGalliard, Account No. 13962 or 3852216, and to hold such funds pending ruling by this court as to plaintiff's entitlement thereto." Before leaving court on September 18, 1992, Debtor was aware that this order had been or would be entered by the court on September 18, 1992.

12. Later in the afternoon on September 18, 1992, after the conclusion of the hearing in district court, counsel for FLC called Cowen & Company and learned that the check from Cowen & Company had been sent to Debtor at King Studio and was payable to Debtor. Upon receiving this information, counsel for FLC returned to the district court and informed the judge of this additional information. At that time, which was after 5:00 p.m., the district court judge issued a "verbal order" that Debtor not dispose of the funds and that he tender such funds to his attorney to be held by the attorneys until the priorities could be resolved. This development occurred without notice to Debtor or his attorney; however, a letter was faxed by the attorney for FLC to Debtor's attorney on the late afternoon of September 18, 1992, which stated that the district court judge had "ordered Mr. McGalliard not to dispose of any such funds, Mr. McGalliard is to immediately tender all such funds to you and that you and I are to put them in a joint escrow account and hold them until the priorities can be resolved."

13. No evidence was offered as to when the attorney for Debtor learned of the foregoing letter, and there was no evidence that Debtor received a copy of the letter on September 18, 1992, or that Debtor received notice of the "verbal order" by the district court judge.

14. On the late afternoon or evening of September 18, 1992, Debtor received the check from Cowen & Company which had been mailed to King Studio. The check was made payable to Debtor and not to the IRS. Debtor retained possession of the check over the weekend. At approximately 8:30 a.m. on Monday morning, September 21, 1992, Debtor took the check to the office of the IRS, endorsed it, and delivered it to the IRS. This was done without notice to FLC or its attorney.

15. On September 21, 1992, at 5:00 p.m. another order was entered in the district court of Wake County, which, among other things, directed Debtor to deliver the check from Cowen & Company to the attorney for FLC. However, at the time this order was entered Debtor already had delivered the check to the IRS.

16. At the time that the check for $83,653.77 was delivered to the IRS on September 21, 1992, Debtor was indebted to the IRS for personal income taxes and for withholding taxes in an amount in excess of $83,653.77. When the check was delivered to the IRS, Debtor was aware that most, if not all, of the proceeds of the check would be retained by the IRS. However, Debtor later learned that Cowen & Company mistakenly had issued its check for $1,862.56 more than Debtor was entitled to receive. Thereafter, Debtor requested the IRS to remit the overpayment of $1,862.56 to Cowen & Company and the IRS did so. Except for the refund of this overpayment, the IRS retained the entire proceeds of the check which Debtor delivered to the IRS on September 21, 1992.

17. On September 29, 1992, after failing to appear at a contempt scheduled for September 25, 1992 in the District Court of Wake County and after RLC's counsel informed Debtor's counsel of his intent to seek an order for Debtor's arrest for failure to appear, Debtor filed a Chapter 13 petition for relief.

## LEGAL CONCLUSIONS AND DISCUSSION

FLC contends that Debtor's delivery of the check to the IRS, under the circumstances of this case, constituted an act which was intended by Debtor to hinder and delay

FLC, as a creditor of Debtor, and is grounds for denial of discharge under § 727(a)(2)(A). Plaintiff also contends that its claim against Debtor should be declared to be nondischargeable under § 523(a)(6) on the grounds that the payment to the IRS was a willful and malicious act which injured FLC or property of FLC. The court will deal separately with each of these contentions.

### 1. Section 523(a)(6)

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." In order to prevail under this provision a creditor must show by a preponderance of the evidence that there has been a willful act, that the act was malicious, and that it resulted in injury to the plaintiff or the property of the plaintiff. Arguably, in this case, FLC has satisfied the requirements of showing an act which was both willful and malicious. However, FLC failed to show a debt resulting from willful injury to FLC or property of FLC. Therefore, FLC is not entitled to relief under § 523(a)(6).

FLC never acquired a lien against the funds held by Cowan & Company nor against the check which it issued to Debtor. FLC never levied upon the funds, and the order entered by the state court did not purport to grant a lien or security interest in favor of FLC. Debtor had funds and FLC held a debt, but FLC did not have any property interest in the funds. Unless a creditor has a property interest there cannot be injury to "property" of the creditor. *In re Campbell*, 44 B.R. 116 (Bankr.M.D.Fla.1984). The property interest may be an intangible property interest, or may consist of rights created by contract. *See St. Paul Fire & Marine Ins. Co.*, 779 F.2d 1003 (4th Cir.1985) (debtor's use of contract proceeds to buy luxury items for himself, after he had agreed with surety which had provided financing, to deposit check in a trust account to be disbursed to the surety, amounted to willful and malicious injury to property of the surety). However, there must be some kind of property interest before a creditor can prevail under § 523(a)(6) on the basis that there has been a willful and malicious injury to proper-

ty of the creditor. In the present case, FLC had no property interest in the funds or the check. There was no contract, court order, or other legal process which granted any rights to FLC with respect to the funds or the check. Therefore, there was no injury to "property" of FLC as required by § 523(a)(6).

Likewise, there was no injury to FLC within the meaning of § 523(a)(6). In order to say that an act caused "injury" within the meaning of § 523(a)(6), the act must be such that it gives rise to a legally cognizable claim which could result in a monetary judgment. Otherwise, no debt arises as a result of the act, and, if there is no debt as a result of a willful and malicious act, § 523(a)(6) does not come into play. In this case, there is a debt to FLC because Debtor breached an equipment lease. However, no new or additional claim arose when Debtor delivered the check to the IRS because the delivery did not violate any rights of FLC and thereby give rise to any new claim. The result is that there was no injury to FLC or to property of FLC, and, therefore, no grounds under § 523(a)(6) to treat the debt of FLC as nondischargeable.

### 2. Section 727(a)(2)(A)

A significant difference between § 727(a)(2)(A) and § 523(a)(6) is that § 727(a)(2)(A) does not focus upon whether there has been injury to property of a creditor. Instead, § 727(a)(2)(A) focuses upon whether the debtor transferred any of his or her property with intent to hinder or delay a creditor—without regard to whether the creditor had an interest in the property. Thus, § 727(a)(2)(A) provides:

> The court shall grant the debtor a discharge, unless—
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed ... or concealed ...
>
>> (A) property of the debtor, within one year before the date of the filing of the petition....

While a creditor bears the burden of proof in § 727 dischargeability actions only by a preponderance of the evidence, *Grogan v.*

*Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Combs v. Richardson,* 838 F.2d 112 (4th Cir.1988), "the general denial of a discharge under § 727(a) is a drastic remedy that is not to be taken lightly by a court. It is, therefore, incumbent upon an objecting creditor to marshall clear and cogent evidence of a debtor's violative conduct under the specific dictates of § 727(a) in order to prevail." *In re Zinke,* 174 B.R. 1017, 1024 (Bankr.N.D.N.D.1994).

It is well established that the intent required under § 727(a)(2) must be actual intent on the part of the debtor, as opposed to constructive intent. *See e.g., In re Elholm,* 80 B.R. 964, 968 (Bankr.D.Min.1987). This requires that there be not only a deliberate act, but also that there be a specific intent to harm in the sense of delaying or hindering a creditor. *In re Weber,* 99 B.R. 1001, 1017 (Bankr.D.Utah 1989). However, specific intent may be proven by surrounding circumstances. *In re Ferrato,* 156 B.R. 83, 86 (Bankr.M.D.Fla.1993) ("actual intent may be discovered from all the circumstances of a case").

While § 727(a)(2) requires the specific intent to hinder or delay a creditor, it does not require a finding of intent to defraud. The elements of the statute must be read in the disjunctive. *Weber* at 1016 (" '[I]t is not necessary to prove fraud; because the statutory language is disjunctive, an intent to hinder or delay suffices;' " citing *In re Somerville,* 73 B.R. 826, 834 (Bankr.E.D.Pa. 1987)). Nevertheless, it also is clear that § 727(a)(2) "does not deny a discharge every time that the debtor's acts result in a delay or hindrance to a creditor. If this were otherwise, the mere act of filing in bankruptcy, because its effect is to delay and hinder creditors, would deny the debtor his discharge." *In re Wojtala,* 113 B.R. 332, 335 (Bankr.E.D.Mich.1990). Further, as used in § 727(a)(2) "hinder or delay" requires more than insignificant or trivial delay or impairment. A transfer which results in a reduction of assets available to a creditor so as to substantially and materially hinder or delay the creditor's ability to obtain payment satisfies the requirements of § 727(a)(2). *In re Weber, supra* at 1017. Although the mere intent to prefer one creditor over another cannot be equated with the intent to hinder, delay, or defraud required under § 727(a)(2), a debtor may not act to prefer one creditor with a specific intent to impermissibly hinder and delay another creditor. *Weber* at 1018.

As pointed out in *In re Wojtala, supra,* the test for the applicability of § 727(a)(2) is not the *effect* of a transfer, i.e., whether a transfer has the effect of delaying or hindering a creditor. Rather, the focus is upon the *intent* of the debtor, i.e., whether the transfer was made with the intent of delaying or hindering a creditor. Thus, the courts look not at the result of the debtor's action, but at his intent while he is carrying out his actions.

In the context of § 727(a)(2), proof of intent is difficult, as it is in other contexts, and usually requires a resort to circumstantial evidence. *In re Afonica,* 174 B.R. 242, 246 (Bankr.N.D.Oh.1994) ("a finding of actual intent may be based upon circumstantial evidence or inferences drawn from a pattern of conduct"); and *In re Erdman,* 96 B.R. 978, 985 (D.N.D.1988) ("it is well settled that [specific] intent may be established by circumstantial evidence with inferences permitted to be made from Debtor's actions"). Rare is the case in which the debtor openly admits to an intent to defraud, delay or hinder his creditors. However, careful scrutiny of all of the circumstances surrounding a transfer of property or other action by a debtor may disclose that which he is unwilling to admit. The courts have developed certain "badges" which are regarded as highly indicative of a debtor's intent for purposes of § 727(a)(2). These factors include: (1) whether the transaction is conducted at arm's length; (2) whether the debtor is aware of the existence of a significant judgment or overdue debt; (3) whether the debtor is aware that a creditor is in hot pursuit of its judgment/claim; and (4) the timing of the transfer relative to the filing of the petition. *See e.g., In re Wojtala,* 113 B.R. at 336–337. There is no requirement under § 727(a)(2) that the debtor attempt to defraud, delay, or hinder all or even most of his creditors. All that is required is that the debtor act with the intent

to hinder or delay a single creditor. *Id.* (citing *In re Oberst*, 91 B.R. 97, 101 (Bankr. C.D.Cal.1988)). Furthermore, while just one of the "badges" of intent to impermissibly hinder or delay is sufficient for § 727(a)(2) purposes, "the accumulation of several factors indicates strongly that [a] debtor possessed the requisite intent." *In re Lightfoot*, 152 B.R. 141, 148 (Bankr.S.D.Tx.1993). *See also In re Ingersoll*, 124 B.R. 116, 122 (M.D.Fla.1991) (presence of one factor is sufficient).

■ In the present case, the court has carefully considered the circumstances surrounding the transfer in question as disclosed by the evidence in this case, and has noted that several of the "badges" of intent are clearly present. Having done so, the court has concluded that Plaintiff has satisfied the burden of showing by a preponderance of the evidence that when Debtor made the payment to the IRS on September 21, 1992, he did so with the intent to delay and hinder Plaintiff, within the meaning of § 727(a)(2). At the time of the transfer to the IRS, Debtor was aware that a judgment had been entered against him. He was aware that the judgment creditor, Plaintiff in this case, was attempting to collect that judgment. This came to his attention in several ways. He was aware of the entry of the judgment because it was entered at the conclusion of a hotly contested trial at which Debtor testified. He also was aware that Plaintiff had served on him a notice of his right to claim exemptions, as a result of which Debtor filed a claim to his exemptions. Plaintiff objected to Debtor's claim for exemptions and at the resulting hearing, Debtor disclosed his retirement account at RJR. Debtor was made aware that Plaintiff intended to attach the retirement account if possible. The creditor secured an order which directed Debtor to cooperate with the creditor in determining the status of the retirement account. The evidence at trial, and the foregoing facts in particular, satisfy the court that Plaintiff was in hot pursuit of Debtor, and, in particular was in hot pursuit of Debtor's retirement account—and, further, that Debtor was fully aware of this hot pursuit by the creditor. The actions which Debtor thereafter took, against this backdrop, also

satisfy the court that Debtor concealed and transferred assets consisting of the retirement account and the funds withdrawn from that account, with the intent to hinder and delay a creditor, namely, Plaintiff in this case. First, Debtor withheld information about the retirement account after being ordered by the state court to cooperate by supplying information or assisting in obtaining information. Secondly, without notice to the state court or the creditor, Debtor cashed in the account and obtained the funds from his employer. Debtor then held the check from the employer for—approximately a month before he finally deposited the funds into another account. Again, Debtor acted without supplying information to the creditor as he had been ordered to do, and opened an individual retirement account with a broker in New York. In doing so, Debtor moved the funds from a location known to the creditor to a new location which was unknown to the creditor. Ordinarily a debtor has no obligation to keep a creditor fully informed about a particular asset. However, in this case, Debtor had been ordered by the state court with jurisdiction over these parties to provide information for this particular creditor. This circumstance distinguishes this case from the ordinary, commonplace situation, and severely limits the actions which could have been taken by this debtor before he placed himself in a position in which it could be said that he acted with the intent to hinder or delay one of his creditors. Debtor's conduct regarding the retirement account after the creditor turned up the heat of the pursuit by scheduling an additional hearing constitutes further proof of his intent to hinder and delay the creditor. With the hearing only a few days away, Debtor put in motion the steps required to cash in the individual retirement account and place the funds beyond the reach of the creditor. Acting with such haste that he made the request by telephone rather than submitting written instructions, Debtor directed that the account be closed and the funds be made payable to the IRS. This suggests that Debtor did not want to risk having Cowan make the check payable to him so that he would have to deposit it into an account before he could

pay the IRS. Instead, he requested the distribution of the funds in a manner in which the check could be cashed only by the IRS. Apparently, Debtor also requested that the check be sent directly to the IRS—further evidence of an intent on his part to ensure that the funds could not be seized or attached by Plaintiff. Thereafter, at the hearing in state court, Debtor provided incorrect information to the court when he told the court that the check was payable to the IRS and had been sent to the IRS by this broker. There was no direct evidence, however, that Debtor was aware at the hearing that the broker had made the check payable to Debtor and mailed it to Debtor's business address. However, within a few hours after testifying, Debtor learned that the testimony he had given under oath to the state court was incorrect. Debtor made this discovery when he returned and found that the check had been sent to him and was payable to him. With full knowledge that he had supplied incorrect, false information and misled both the court and the creditor, Debtor delivered the check to the IRS on Monday, the next business day following the hearing on the previous Friday. The circumstances surrounding this conduct further establish Debtor's intent to hinder and delay Plaintiff. First, by Debtor's own admission, he did so as soon as the IRS office opened at 8:30 a.m. on Monday morning. Again, Debtor did not risk depositing the check into his account, but instead signed the check from the broker directly over to the IRS.

■ The requisite intent to delay or hinder a creditor may be found where a debtor deals with his assets in a manner designed and intended to avoid seizure or attachment by one or more of his creditors. For example, where a debtor reduces an asset to cash so that he can carry the money on his person to keep it in his home in order to prevent the money from being attached or garnished, his actions fall within the purview of § 727(a)(2) and he will be denied a discharge. *Losner v. Union Bank,* 374 F.2d 111 (9th Cir.1967). The same is true of a debtor who had previously used his own checking account to pay his business expenses but started depositing his money into a joint account he had with his wife, and then started writing checks on that account after a judgment creditor had attached his personal account. *In re Magenis,* 6 C.B.C. 527 (Bankr.D.Ore.1975). Similarly, in the present case, Debtor handled his retirement account in a manner designed to avoid the attachment or seizure of the account by Plaintiff.

Additionally, Debtor took the check to the IRS with full knowledge that an order had been entered by the state court which was intended to prevent the funds from being paid to the IRS. While the order was directed to the broker and not to Debtor, Debtor knew that the order had been issued in this fashion only because Debtor had supplied incorrect information to the court on the previous Friday. At the very least, Debtor knowingly took advantage of a situation brought about by his having misled the court and the creditor with false information. If, as contended by Debtor, he did not know the information was false when he gave it under oath, he certainly knew he had given false information when he took the check to the IRS on the following Monday morning and took advantage of the situation created by that false information. These facts satisfy the court that Debtor in this case acted with great haste and with the specific intent of circumventing the orders of the state court and delaying and hindering Plaintiff.

■ It is true that merely paying one creditor instead of another, or preferring one creditor, does not constitute a violation of § 727 and is not adequate grounds for denying a debtor a discharge. *In re Parsell,* 172 B.R. 226, 230 (Bankr.N.D.Oh.1994). However, in this case, as the foregoing facts illustrate, Debtor did much more than merely pay one creditor instead of another. The circumstances surrounding that payment establish the requisite intent to hinder and delay on the part of Debtor.

Debtor admitted during the trial that within days after the transfer he filed his Chapter 13 case in order to "keep from going to jail" as a result of being in contempt of the orders entered by the state court. Debtor's conduct in this case may not be excused or explained away by pointing out that in mak-

ing the transfer he paid a legitimate creditor rather than putting the money in his wife's name or depositing it in a Swiss bank account. In fact, Debtor acted in his own self interest by paying indebtedness which would not be discharged in a subsequent bankruptcy case. Reduced to its simplest terms, Debtor in this case planned and executed a course of action which hindered and delayed Plaintiff to the extent necessary to enable Debtor to pay the creditor which most benefitted Debtor. Under the circumstances in this case, and pursuant to § 727(a)(2), Debtor forfeited his right to a discharge in his Chapter 7 case which he filed after the dismissal of his Chapter 13 case.